1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAVID H. SCHWARTZ (SBN 62693)
NANCY CHUNG (SBN 225584)
LAW OFFICES OF DAVID H. SCHWARTZ, INC.
423 Washington Street, Sixth Floor
San Francisco, CA 94111
Tel: (415) 399-9301
Fax: (415) 399-9878
E-mail:  dhs@lodhs.com

Attorneys for Plaintiff Poppi Metaxas

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| POPPI METAXAS<br><br>            Plaintiff,<br><br>        vs.<br><br>KENNETH LEE, VINOD THUKRAL, TIM GREEN, JAMES JOSEPH KEEFE, DALE McKINNEY, COLIN MADDEN, JEFF CHEUNG, LAWRENCE FENTRISS, and LAWRENCE WANG<br><br>            Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>[Demand for Jury Trial] |

I.      INTRODUCTION

1.      Gateway Bank FSB ("GATEWAY") is a small Federally Chartered Savings Bank headquartered in Oakland, California. From 1995 to May 25, 2010, Plaintiff Poppi Metaxas was the Chief Executive Officer of GATEWAY.  Prior to Plaintiff's becoming CEO, GATEWAY had never been profitable. Under her tenure, by the early 2000's GATEWAY's performance showed a return on equity that was first or second in the nation for banks with over $100 Million in assets. GATEWAY also consistently received regulatory ratings of "Excellent." By 2004, Plaintiff was being actively recruited for executive positions in much larger banking institutions

offering substantially higher compensation than she was receiving at GATEWAY. Plaintiff asked the GATEWAY Board of Directors for an increase in her compensation of $250,000 to $300,000 annually so that she could establish retirement savings, in order for her to remain at GATEWAY.

2.      In 2004, in return for Plaintiff's agreement to remain CEO of GATEWAY, GATEWAY agreed to increase Plaintiff's base compensation from $200,000 per year to approximately $490,000 per year. The additional $290,000 annual increase was to be used over the next seven years to purchase a $5 Million life insurance policy that would fund a customized supplemental executive retirement plan ("SERP") which would pay Plaintiff ERISA benefits upon her retirement at age 60. The insurance policy called for seven years of premiums to be made, and all seven premiums were paid by GATEWAY using Plaintiff's deferred compensation. Under the SERP, if Plaintiff voluntarily terminated her position before retirement, she remained entitled to the Plan's then Accrued Benefit upon termination.

3.      In 2008 Plaintiff developed cancer, underwent surgery, and began an arduous regime of chemotherapy. In March 2010, Plaintiff went on sick leave and in May 2010 tendered her resignation due to health reasons. Plaintiff subsequently was granted full disability benefits under the long-term disability coverage GATEWAY provided to Plaintiff. Under the terms of the SERP, GATEWAY recorded liabilities of, and Plaintiff was entitled to, at a minimum, $1,236,448 in SERP Accrued Benefits, while the cash surrender value of the SERP life insurance policy was $1,867,581.

4.      By late 2008, GATEWAY, along with most banks in the United States, was experiencing difficulties in meeting its regulatory requirements due to the ongoing financial crisis. The federal Office of Thrift Supervision ("OTS"), which then oversaw federally chartered savings banks such as GATEWAY, instructed GATEWAY to increase its capital position to provide coverage for potential losses from increasing levels of troubled assets.  GATEWAY's board of directors further directed all board members and senior executives to endeavor to raise capital and sell the troubled assets. At the same time, in a series of transactions orchestrated by Michael Kenny, a GATEWAY Vice President, GATEWAY made a "Working Capital Loan" to

its largest customer, Ideal Mortgage, and approved the sale and financing of certain non-performing loans ("NPLs") and foreclosed properties ("REOs") (the "Troubled Assets Sale"). Despite a successful capital raise and the Troubled Assets Sale, on April 24, 2009 the OTS issued a cease and desist order, requiring GATEWAY maintain certain minimum regulatory capital ratios, remain within a maximum assets size, reduce its percentage of "classified" or Troubled Assets to a specified maximum, and requiring GATEWAY to establish a Regulatory Compliance Committee to oversee GATEWAY's compliance with the cease and desist order.

5.      Due to her health issues, Plaintiff was being assisted in her role as CEO by a GATEWAY board member who was the retired regional director of the FDIC.  In June 2009, the GATEWAY Board of Directors replaced the retired FDIC Regional Director with a Regulatory Compliance ("RCC") committee that included Board Members James Baxter, JoAnne Fabian, and Defendant Lawrence Wang. The RCC undertook oversite for the day-to-day operations of the bank.

6.      In June of 2009 OTS notified GATEWAY that it was questioning the valuation GATEWAY had put on the NPLs and REOs that were the subject of the Troubled Asset Sale. In November 2009 the U.S. Department of Justice, on behalf of the Department of Housing and Urban Development, sued Ideal Mortgage civilly for making false representations in applying for FHA backed mortgages. Shortly thereafter Ideal Mortgage lost its FHA lending license, stopped writing mortgages, and defaulted on the Working Capital Loan, following which GATEWAY seized assets of Ideal Mortgage in its possession in partial payment of the amounts due on the Working Capital Loan. In March of 2010 OTS informed the GATEWAY Board that the purchasers in the Troubled Asset Sale had been under common control with Ideal Mortgage, that the proceeds of the Working Capital Loan had been used to fund the down payments on the Troubled Asset Sale, and that OTS now considered this an improper "round trip transaction" putting GATEWAY under further regulatory scrutiny. (Henceforth the combination of the Working Capital Loan and the Troubled Asset Sale will sometimes be referred to as the "Round-Trip Transaction".

7.      The actions of the OTS including the Cease and Desist Order and the scrutiny of the Round-Trip Transaction meant that any future failure of GATEWAY to keep its capital percentage and Troubled Assets levels below the thresholds set by the OTS, and/or any conclusion that the Board of Directors had intentionally or negligently knowingly authorized a "round trip transaction," could result in federal regulators replacing the directors and officers of the bank, and/or requiring significant cash infusions into GATEWAY or its sale to a larger institution. In response, the defendant officers and directors, some of whom also were shareholders, carried out a series of financial manipulations and initiated a pattern of filing false financial reports with the federal regulators, in order to stay within the capital requirements imposed on GATEWAY by the OTS Cease and Desist Order. The manipulations of GATEWAY's financial books and the resulting false regulatory filings constituted violations of several different federal statutes that are predicate acts under 18 U.S.C. § 1961 including violations of 18 U.S.C. §§ 664, 1006, 1956, 1957, 1341, and 1343.   The manipulations and false reporting included the following:

    a.      Unbeknownst to Plaintiff, the funds wired to GATEWAY as the down payments for the Troubled Asset Sale, were wired to the account of Ideal Mortgage, but GATEWAY wrongfully and illegally appropriated those funds for its own account. When GATEWAY reported its financials to OTS for the period ending March 31, 2009, it falsely reported $3,817,887 in cash it had received in connection with the sale of non-performing assets as its own when the wired funds belonged to Ideal Mortgage. This false reporting to OTS and the successor regulator, the federal Office of Controller of the Currency ("OCC"), has recurred on at least a quarterly basis from 2009 to the present and on each occasion has constituted a violation of 18 U.S.C. § 1006;

    b.      Plaintiff does not yet have knowledge as to the precise time, but is informed and believes, and upon that basis alleges, that sometime in the first six months of 2010, most probably in April of 2010, after Plaintiff had gone on sick leave, then CFO Defendant Tim Green modified the financial records of GATEWAY to falsely abstract GATEWAY's liability to Plaintiff under her SERP plan and thereby report the value of

the life insurance policy purchased to fund Plaintiff's SERP benefits as a "net" asset of GATEWAY with no corresponding liability to Plaintiff, even though the life insurance policy had been purchased using Plaintiff's money. This abstraction was in violation of the terms of the SERP agreements, was never authorized by the GATEWAY Board of Directors, and Plaintiff is informed and believes, and upon that basis alleges, that when Defendant Green made this modification to GATEWAY's balance sheet he understood and believed that GATEWAY remained obligated to Plaintiff under the terms of the SERP. The abstraction constituted a violation of 18 U.S.C. § 664. For the March 31, 2010 reporting period, GATEWAY's false reporting that its net assets included the full value of the SERP life insurance policy without any liability to Plaintiff resulted in falsely overstating its net assets by $1,851,000; and falsely inflating GATEWAYS percentage of risk based capital to 13.98% -- near the 14% level that OTS had demanded in its Cease and Desist Order. This false reporting to OTS and the successor regulator, the federal Office of Controller of the Currency ("OCC"), has recurred on at least a quarterly basis from 2009 to the present time. The initial and ongoing making of false reports constitute violations of 18 U.S.C. 1341 and 1343;

c.        In November of 2010 Defendant Green, in his capacity as GATEWAY's CFO, had GATEWAY restate its financial statements for the fiscal year ending June 30, 2009, reversing the recording of the Troubled Assets sale and the Working Capital Loan, recognizing that GATEWAY had never transferred title to the non-performing assets and hence no sale had ever taken place.  Although GATEWAY had credited the $3.8 Million of down payments on the Troubled Assets sale as an asset of GATEWAY, when GREEN reversed the Troubled Asset Sale in the November 2010 financial restatement, he did *not* transfer the down payment money to an account for the benefit of Ideal Mortgage, but continued to maintain them in an account belonging to GATEWAY. Thus, GREEN had GATEWAY keep the money it had fraudulently converted to its account in 2009 claiming it was part of the Troubled Asset Sale despite having GATEWAY now acknowledge the Troubled Asset Sale never had been

consummated and that GATEWAY had never transferred title to the Troubled Assets. Subsequently, GREEN and Defendant CHEUNG, who had become President and CEO of GATEWAY in May of 2010, caused GATEWAY to falsely report to the OTS/OCC the additional $3.8 Million Troubled Assets sale down payments as assets of GATEWAY. This false reporting to OTS and the successor regulator, the federal Office of Controller of the Currency ("OCC"), has recurred on at least a quarterly basis from 2010 to the present time. The false reporting of GATEWAY's financial condition through U.S. mails and wires initially and on an ongoing basis with the intent to have the OTS/OCC rely on the false statements in evaluating whether GATEWAY was in compliance with its regulatory orders were violations of 18 U.S.C. §§ 1341 and 1343.

d.      On information and belief, Plaintiff alleges that starting in approximately August 2014, Defendant Keefe became President and CEO of GATEWAY and held that post until approximately June of 2018. On information and belief, Plaintiff alleges that in approximately March of 2015 through approximately March of 2017 Defendant Lee held the post and/or acted as the CFO of GATEWAY. During their respective terms as officers of GATEWAY, Defendants Keefe and LEE had GATEWAY report  financials to the FDIC and OTS/OCC on a quarterly basis falsely representing that the Troubled Asset sale down payment money was an asset of GATEWAY and that the SERP life insurance policy purchased with Plaintiff's compensation money was also GATEWAY's asset without any corresponding liability to Plaintiff under the SERP. By doing so Keefe and Lee avoided having GATEWAY's capital position fail the requirements set by the FDIC and OTS/OCC. Keefe's and Lee's false reporting of GATEWAY's financial condition through U.S. mails and wires initially and on an ongoing basis with the intent to have the FDIC and OTS/OCC rely on the false statements in evaluating whether GATEWAY was in compliance with its regulatory orders were violations of 18 U.S.C. §§ 1341 and 1343.

8.      In March of 2014 Plaintiff was indicted in the Eastern District of New York on three counts of criminal violations stemming from the Round-Trip transaction. The indictment

was predicated upon a reference from OTS/OCC which had received a document purporting to show that Plaintiff had conspired with Ideal Mortgage to set up the Round-Trip Transaction on a quid pro quo arrangement with Ideal Mortgage, that Plaintiff had intended to damage GATEWAY by entering into the conspiracy, that Plaintiff had intentionally misled the GATEWAY Board inducing the Board to approve the transactions, and that GATEWAY had, in fact, been damaged by the Round-Trip Transaction.

9.      The document upon which the OTS/OCC had made its referral was a forgery. Plaintiff had no knowledge as to the relationship between Ideal Mortgage and the buyers in the Troubled Asset Sale beyond what was presented in documentation to the Board of Directors, and the Round-Trip Transaction actually resulted in a *gain* to GATEWAY of over $1.8 Million. The GATEWAY Board had been notified by OTS in March of 2010 that OTS believed Plaintiff had conspired with Ideal Mortgage to set up the Round-Trip Transaction with a proffered quid pro quo, and the GATEWAY Board had ordered an internal investigation of that charge. After hearing the results of the internal investigation, the GATEWAY Board discharged Michael Kenny for his role in the Round-Trip Transaction, but made no determination that Plaintiff had acted improperly, nor did it ever discipline Plaintiff or terminate Plaintiff for any reason, but had unanimously accepted her resignation for health reasons and had not challenged her claim for permanent total disability with GATEWAY's disability insurance carrier. At no time has Plaintiff ever been charged with, nor has any evidence ever been presented to Plaintiff showing, that she received any personal gain in connection with the Round-Trip Transaction.

10.     Plaintiff alleges on information and belief that, despite the Board never having terminated or disciplined Plaintiff, or found her at fault in any way for the Round-Trip Transaction, defendant directors and officers, in order to cover up or divert attention from their false reporting of GATEWAY's true financial condition, and in order to divert attention away from possible negligence regarding the Board's own approval of the Round-Trip Transaction, promoted the narrative that Plaintiff had intentionally misled the GATEWAY Board into approving the two parts of the Round-Trip Transaction, and that the Round-Trip Transaction had damaged GATEWAY, by repeatedly making false statements to agents of the Federal Bureau of

Investigation and/or federal prosecuting attorneys investigating the allegations against Plaintiff and/or making false statements in sworn affidavits submitted in the criminal proceedings against Plaintiff in the Eastern District of New York. These repeated false statements constituted predicate acts under 18 U.S.C. § 1961, including 18 U.S.C. §§ 1503 and/or 1512. These false statements included:

     a.   On June 15, 2011 Defendant GREEN falsely represented to agents of the Federal Bureau of Investigation investigating criminal conduct connected with the operation of Ideal Mortgage, that GATEWAY had been damaged by the Round-Trip Transaction in the amount of $5,407,000;

     b.   On June 3, 2013, Defendant GREEN gave a second interview with agents of the Federal Bureau of Investigation in which he falsely represented that Plaintiff's actions in connection with the Round-Trip Transaction had damaged GATEWAY by approximately $7.7 Million;

     c.   On November 12, 2014 Defendant Fentriss falsely represented to agents of the Federal Bureau of Investigation that Plaintiff had been "fired" from her position as CEO of GATEWAY;

     d.   On November 18, 2014 following the indictment of Plaintiff, Green gave a third interview to agents of the Federal Bureau of Investigation and AUSA's in which he made false statements concerning conversations he had had with Plaintiff;

     e.   On November 23, 2015, Defendant KEEFE signed an affidavit filed with the Eastern District of New York falsely stating that due to PLAINTIFF's actions in connection with the Round-Trip Transaction GATEWAY had suffered $13,755,166 in losses;

     f.   On December 18, 2015 Defendant Keefe submitted a second affidavit in the criminal proceedings against Plaintiff in the Eastern District of New York falsely stating that GATEWAY had suffered over $6 Million

1    in losses due to Plaintiff's conduct in connection with the Round-Trip

2    Transaction.

3    11.    Shortly before her 60th birthday, at which time she became eligible for benefits

4    under her SERP Plan, Plaintiff made a claim to the SERP Administrative Committee at

5    GATEWAY requesting her benefits. The SERP Administrative Committee denied her claim.

6    Plaintiff then appealed her claim to the SERP appeals committee, consisting of Defendants and

7    GATEWAY Directors THUKRAL, MCKINNEY, and MADDEN, who, on May 22, 2017,

8    denied Plaintiff's appeal. The denial contained false statements concerning Plaintiff, including,

9    among other things, that she had been fired for cause by GATEWAY and that she had

10   intentionally misled the GATEWAY Board of Directors as to the business purposes of the

11   Working Capital Loan and the Troubled Assets Sale. The members of the SERP Appeals

12   Committee used the United States mail and interstate wires to transmit these false statements in

13   violation of 18 USC §§ 1341 and 1343 as a part of the continuing operations of GATEWAY

14   through a pattern of racketeering predicate acts.

15   12.    The denial of Plaintiff's claim for SERP benefits by the SERP Administrative

16   Committee was predicated upon (a) the fact that Plaintiff resigned and (b) Plaintiff's conviction

17   on one count of conspiracy to commit bank fraud.  Plaintiff considered the reasons stated by the

18   SERP Administrative Committee to be erroneous and unsupported by the terms of her SERP

19   Plan, but at the time of the denial of her SERP benefits by the Administrative Committee

20   Plaintiff had no knowledge of any act or pattern of racketeering activity by Defendants, that

21   almost six years prior to the denial of her SERP benefits by the Administrative Committee

22   Defendants had violated 18 U.S.C. § 664 by wrongfully abstracting GATEWAY's SERP PLAN

23   liability to PLAINTIFF so that GATEWAY could falsely report to regulators that it was meeting

24   its regulatory requirements,  or that the denial of her SERP in 2016 benefits was in furtherance of

25   such racketeering activity. Plaintiff did not discover she had been injured in her business and

26   property through a pattern of racketeering activity until  sometime after January 20, 2017, the

27   date she received the GATEWAY general ledger from GATEWAY in discovery in a suit

28   brought by GATEWAY against Plaintiff in the State Court Action. In reviewing that general

ledger, Plaintiff first learned that Defendant GREEN had fraudulently abstracted GATEWAY's SERP liability to Plaintiff in the Spring of 2010, had falsely misstated GATEWAY's capital when he restated the GATEWAY financials in November 2010, and, through an analysis by a forensic accountant, determined that GATEWAY had not suffered any loss from the Round-Trip Transaction but had, in fact, made a profit from that transaction. From learning these facts Plaintiff was first put on notice (a) that since 2010 Defendants had been making false statements about GATEWAY's financial condition and capital to the FDIC and OTS/OCC, (b) that denying GATEWAY's SERP liability to Plaintiff was integral to, and necessitated by, Defendants ongoing practice of misrepresenting the bank's financial condition to federal regulators, and (c) that Defendants GREEN, FENTRISS, and KEEFE had provided false information to the FBI and the District Court for the Eastern District of New York in furtherance of their operation of GATEWAY as a racketeering enterprise.

13.     Plaintiff was directly injured by the pattern of racketeering predicate acts by having lost the SERP benefits to which she was entitled and for which she had paid for.

## II.     JURSIDICTION AND VENUE

14.     The First and Second Claims for Relief arise under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Chapter 95, and more specifically 18 U.S.C. § 1962(c) and 1962(d). This Court has original subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred or had effects in this District, because Defendants James Keefe, Dale McKinney, Vinod Thukral, Jeff Cheung, and Lawrence Wang reside in this District and the racketeering enterprise, GATEWAY Bank, FSB conducts business in this District for purposes of 28 U.S.C. § 1391(b).

## III.     PERSONAL JURISDICTION

16.     Personal jurisdiction is predicated upon 18 U.S.C. § 1965(a) and (b) since the Defendants are either residents of the Northern District of California, or have transacted their

affairs in the Northern District of California, and the acts and occurrences in furtherance of the claims alleged herein arose in the Northern District of California, and because the ends of justice require that other parties residing in other districts be brought before the Court.

**IV.     INTRA-DISTRICT ASSIGNMENT**

17.     The actions of defendants that give rise to this action occurred primarily at the headquarters of GATEWAY, which from 2004 to 2011 were located in San Francisco, California, and from 2011 to the present have been located in Oakland, California.

**V.     PARTIES AND PARTICIPANTS IN THE RACKETEERING SCHEME AND OTHER IMPORTANT PERSONAE**

A.     Parties and Participants in the Racketeering Scheme

18.     Plaintiff Poppi Metaxas ("PLAINTIFF") resides in Hillsborough, California.

19.     Defendant Tim Green ("GREEN") was the Chief Financial Officer of GATEWAY from November 2, 2009 to October 22, 2013. GREEN resides in Monterey Park, California.

20.     Defendant Lawrence Wang ("WANG") was a member of the Board of Directors of GATEWAY from 1991 to 2016 and served as Chairman of the Board of Directors from 1991 to 2014. WANG is a shareholder of GATEWAY.  Defendant WANG was a major shareholder in GATEWAY until at least 2015. Defendant WANG resides in Palo Alto, California.

21.     Defendant James Joseph Keefe ("KEEFE") has been a member of the Board of Directors of GATEWAY from October 2010 to the present and has been Chairman of the Board of Directors from 2011 to the present. From 2013 to 2016 Defendant KEEFE was the controlling shareholder of GATEWAY and remains a significant shareholder of GATEWAY. Defendant KEEFE resides in Lafayette, California.

22.     Defendant Jeffrey Cheung ("CHEUNG") was President and CEO of GATEWAY from approximately May 2010 to sometime in 2015 and was a shareholder in GATEWAY. Defendant CHEUNG resides in  Walnut Creek, California.

23.     Defendant Kenneth Lee ("LEE") was the Chief Financial Officer of GATEWAY from March of 2015 to about the end of 2016. LEE resides in Beverly Hills, California.

24.     Defendant Vinod Thukral ("THUKRAL") was a member of the GATEWAY Board of Directors from 2016 to the present. Defendant THUKRAL resides in San Jose, California.

25.     Defendant Dale McKinney ("MCKINNEY") has been a member of the GATEWAY Board of Directors from 2016 to the present. Defendant MCKINNEY resides in San Jose California.

26. Defendant Colin Madden ("MADDEN") has been a member of the Board of Directors of GATEWAY from 2013 to the present and is a shareholder of GATEWAY. MADDEN resides in Seattle, Washington.

27.     Defendant Lawrence Fentriss ("FENTRISS") was a director of GATEWAY from 1996 until 2012. Personally, and through a company in which he was a principal – Community Bank Investors of America (CBIA) , Defendant FENTRISS was a shareholder in GATEWAY until at least 2012. Plaintiff is informed and believes, and on that basis alleges, that Defendant FENTRISS resides in Florida.

28.     James Baxter was a director of GATEWAY from at 1998 until his death in 2014. James Baxter was a significant shareholder in GATEWAY until his death.

B.  Other Significant Personae

29.     Tim Anonick was a member of the GATEWAY Board of Directors from 2010 to 2012.

30.     Michael Kenny was an officer at GATEWAY. During the period of 2008 through his termination in May of 2010, Michael Kenny's official position was Vice President. Plaintiff is informed and believes, and on such basis alleges, that Michael Kenny conspired with Michael Ashley and other persons associated with Ideal Mortgage to structure the "Round-Trip Transaction" as part of a larger plan that would have had Ideal Mortgage take control of GATEWAY making Michael Kenny GATEWAY's President and CEO and member of the Board of Directors.

31.     Ideal Mortgage Bankers Ltd. dba Lend America ("Ideal Mortgage") was a mortgage lender that had its principal offices in New York State and was a major participant in GATEWAY's Quick$ale mortgage purchase and sale program.

32.     Michael Ashley was an employee at Ideal Mortgage and its "Chief Business Strategist." On information and belief, Plaintiff alleges that Michael Ashley also effectively controlled Ideal Mortgage, Cooper Capital, Empower International, and the Steven Menna Group, the other participants in the Round-Trip transaction.

33.     Robert Savitsky was a lawyer who counseled and represented Ideal Mortgage.

## VI.   RELEVANT TIMES

34.     The relevant times to this Complaint are from on or about December 2004 to the present.

## VII.   FACTUAL BACKGROUND AND THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY

### A.   PLAINTIFF's Relationship with GATEWAY and Her Use of Her Salary to Purchase a Life Insurance Policy to Fund Her SERP Benefits

35.     In 1993 PLAINTIFF was hired at GATEWAY to be Chief Lending Officer and Chief Compliance Officer. As of the time of her hire, GATEWAY had never made a profit. At the time of her hire GATEWAY had been issued multiple cease and desist orders, a Capital Directive, and had been designated a "Troubled Institution, by its regulator, the Office of Thrift Supervision ("OTS").

36.     From 1993 to 1995 PLAINTIFF's compensation was $60,000 per year. PLAINTIFF voluntarily deferred ten percent of that compensation for two years until GATEWAY became solidly profitable. In 1995 the GATEWAY Board promoted PLAINTIFF to the position of President/CEO and made her a member of the Board of Directors. In 1998 the Board of Directors of GATEWAY increased PLAINTIFF's compensation to slightly less than $100,000 per year.

37.     By 2003, under PLAINTIFF's management, GATEWAY had become "the Bank with the highest return on equity in the nation, (over 60%), among banks with assets over $100

million," according to the U.S. Bank Ratings of the American Banking Journal. As a result of her management success, PLAINTIFF began receiving employment offers from competing institutions and Wall Street firms. PLAINTIFF also expressed concern to the GATEWAY Board that with her current compensation she was not able to properly secure savings for her retirement.

38.    In response to PLAINTIFF's request for increased compensation and recognition of her success in running GATEWAY, and as a result of their concern that PLAINTIFF was being solicited to change jobs with offers of substantially higher compensation than she was receiving from GATEWAY, in 2003 the Compensation Committee of the GATEWAY Board of Directors, consisting of Defendant WANG, and directors JoAnne Fabian, and James Baxter, asked PLAINTIFF to pledge to remain employed with GATEWAY and promised to increase her compensation by approximately $300,000.00 per year soon, so that she could be able to arrange for the retirement benefits she was interested in securing.

39.    By early 2004, GATEWAY under PLAINTIFF's management had obtained third place nationally based on highest return on equity for institutions with assets over $100 Million. The offers from other potential employers to PLAINTIFF became more frequent and lucrative than the year before. In discussions with members of the GATEWAY Board, including Defendant WANG, Jo Ann Fabian, and James Baxter, PLAINTIFF agreed to decline offers of employment from other institutions and commit to remain with GATEWAY in return for GATEWAY increasing her compensation by roughly $300,000 per year.

40.    In July of 2004 GATEWAY retained the services of Main Data Group, Inc. which, in consultation with PLAINTIFF, custom designed a supplemental executive retirement plan ("SERP") for PLAINTIFF that would be funded by participant compensation deferrals to purchase individual life insurance policies.

41.    At the 2004 October and November Board meetings, the Board, in discussions with PLAINTIFF, finalized the SERP PLAN for PLAINTIFF subject to the purchase of a $5 Million life insurance policy to be issued by New York Life Insurance Company.

42.     On December 23, 2004 Defendant WANG executed a "Gateway Bank FSB Supplemental Executive Retirement Plan, effective January 1, 2005, ("SERP PLAN") a true and correct copy of the SERP PLAN is attached to this Complaint as Exhibit A. and incorporated herein.

43.     Also, on December 23, 2004 Defendant WANG, on behalf of GATEWAY, and PLAINTIFF, signed a Participation Agreement for PLAINTIFF's participation in her SERP PLAN. The Participation Agreement provided, *inter alia,* that PLAINTIFF's right to retirement benefits would become effective based upon her 60th birthday, rather than her 65th birthday as set forth in the SERP PLAN. A true and correct copy of the Participation Agreement is attached to this Complaint as Exhibit B.

44.     Under the SERP PLAN for PLAINTIFF, the following provisions, among others, applied:

a.     Section 2.9 of the SERP defined "Disability" as:

Disability. "Disability" means (i) a medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, as a result of which the Participant is unable to engage in any substantial gainful activity or (ii) an above-described impairment from which the Participant is receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of Employer.

b.     Section 2.11 defined the term "Good Reason" as used in the SERP:

Good Reason. · "Good Reason" means without the Participant's consent there occurs:

(a) any material adverse change in the nature and scope of the Participant's position, responsibilities, duties, or a change of fifty (50) miles or more in the Participant's location of employment, and any material reduction in salary or benefits; or

(b) any event which reasonably constitutes a demotion, significant diminution or constructive termination (by resignation or otherwise) of the Participant's employment.

c.     Section 3.1(b) of the SERP set forth what constituted "Participation" in the SERP PLAN:

(b) Participation. An employee's participation in the Plan shall be effective upon notification of such person by Employer of eligibility to participate and completion of any forms required by Employer for participation in the Plan. Except as modified by paragraph 3.2 below, participation in the Plan shall

continue until such time as the Participant terminates employment with Employer and as long thereafter as the Participant is eligible to receive benefits under this Plan.

        d.    Section 3.2 of the SERP PLAN described what was meant by a "Change in Employment Status":

Change in Employment Status. If the Board determines that a Participant's employment performance is no longer at a level which deserves reward through participation in this Plan, but does not terminate the Participant's employment with Employer, participation herein and eligibility to receive benefits hereunder shall be limited to the Participant's Accrued Benefit calculated on the date of the Change in Employment Status and shall only be payable if the Participant attains Retirement with Employer or becomes disabled while Employed by Employer.

        e.    Section 5.3(b) of the SERP PLAN set forth PLAINTIFF's right to receive benefits upon termination of her employment other than upon a change in control of GATEWAY:

Termination Benefit.

(b) Notwithstanding Section 3.2, if a Participant's employment terminates prior to the participant's Retirement Date under any other circumstances than those described in Section 5.3(a) [pertaining to a change in control of GATEWAY], the benefit payable, in lieu of any other benefit under this Article V, shall be the Participant's Accrued Benefit determined on the date of termination. Payments shall commence at the participant's Retirement Date or as soon thereafter as allowed by law.

        f.    Section 9.1 of the SERP PLAN permitted the GATEWAY Board of Directors to terminate the SERP PLAN, but prevented them from removing the "accrued benefits of any Participant:

Termination. Suspension or Amendment of Plan. The Board may, in its sole discretion, terminate or suspend this Plan at any time or from time to time, in whole or in part. The Board may amend this Plan at any time or from time to time. Any amendment may provide different benefits or amounts of benefits from those herein set forth. However, no such termination, suspension or amendment shall adversely affect the benefits of Participants which have accrued prior to such action, the benefits of any Participant who has previously retired, or the benefits of any Beneficiary of a Participant who has previously died.

    45.    On December 23, 2004, pursuant to the SERP PLAN, New York Life Insurance issued policy No. 56 403 405 on the life of PLAINTIFF ("NY LIFE POLICY"). The purpose of the policy was (a) to permit PLAINTIFF to use her deferred compensation to fund the insurance policy, the value of which would grow over time, and (b) provide a $5 Million-dollar death

benefit from which GATEWAY would be reimbursed for its payments of benefits under the SERP PLAN. GATEWAY treated the deferred compensation payments used to pay the NY LIFE POLICY premiums as deductible employee compensation expenses.

46.     Starting in January 2005 and for each year thereafter through January 2010, using PLAINTIFF's compensation which otherwise would have been payable directly to PLAINTIFF, GATEWAY paid an annual premium on the NY LIFE POLICY of approximately $290,000. As of January 2010, six of seven premium payments had been made on the NY LIFE POLICY for PLAINTIFF and it had a cash surrender value of $1,236,448.04.

47.     As of March 31, 2010, GATEWAY carried as accrued liability for PLAINTIFF's SERP PLAN benefits the amount of $1,236,448.04. As of June 30, 2010, the cash surrender value of the NY LIFE POLICY was $1,867,581.

48.     As of January 2011, GATEWAY had made the seventh and last payment on the NY LIFE POLICY, making the policy fully paid up. As of June 30, 2011, the cash surrender value of the NY LIFE POLICY was $2,194,279.

49.     Had PLAINTIFF continued employment with GATEWAY through December 31, 2010, based on discussions with GATEWAY's Board of Directors, PLAINTIFF is informed and believes, and on that basis alleges, that GATEWAY would have begun paying her directly as presently taxable compensation an additional amount of at least $290,000 a year.

50.     In 2010, the  Directors appointed to the Administrative Committee with authority to make decisions regarding PLAINTIFF's SERP PLAN were Defendant WANG, James Baxter, and  JoAnn Fabian.

B.   Events Leading to PLAINTIFF's Resignation as President and CEO of GATEWAY

51.     In 2008, PLAINTIFF was diagnosed with cancer. She underwent surgery in June of 2008, followed in mid-July by double chemotherapy sessions that continued through the end of 2008. Starting in this period PLAINTIFF developed debilitating cervical and lumbar spinal stenosis, as well as debilitating pain from those conditions and her chemotherapy.

52.     By July 2008, the financial crisis in the United States was blossoming. The OTS notified GATEWAY that it was going to conduct a Safety & Soundness Examination starting in

August of 2008. Against advice of her physicians, PLAINTIFF returned to work as President and CEO of GATEWAY on June 16, 2008, just two weeks after her surgery.

53.     George Masa, a retired Regional Director of the Federal Deposit Insurance Corporation assisted PLAINTIFF in fulfilling her duties from July 2008 through approximately the first half of 2009. With OTS' approval, the GATEWAY Board of Directors then established an oversight committee known as the "RCC" to replace George Masa and "insure closer familiarity the GATEWAY's day-to-day operations. The members of the RCC were Defendants WANG and FENTRISS, as well as James Baxter and Jo Ann Fabian. From the beginning of January 2009 at least through PLAINTIFF's dates of resignation on May 26, 2010, the members of the RCC, and particularly Defendants WANG and FENTRISS and James Baxter shared responsibility with PLAINTIFF for the day-to-day operations of GATEWAY including its dealings with Ideal Mortgage, GATEWAY's largest customer through its highly successful Quick$ale Program.

54.     On March 26, 2009 the GATEWAY Board of Directors approved two transactions:  working capital loan to Ideal Mortgage; in the amount of $3.65 million – for which GATEWAY advanced $3.64 million (the "Working Capital Loan"), and the sale of certain "Troubled Assets" on GATEWAY's books comprising a series of six bulk-sales transactions, at a total price of $15.3 million, where three of the six bulk-sales transactions were sales of several distressed residential properties that had been on the books of GATEWAY (known as real-estate-owned, or "REOs"); and the other three transactions were sales of mortgage loans that were non-performing loans on GATEWAY's books at the time of the transactions (referred to as non-performing loans, or "NPLs"). The Working Capital Loan to Ideal Mortgage and the Troubled Assets sale both were approved by the GATEWAY Board of Directors having the same knowledge of the transaction as PLAINTIFF, including the knowledge that PLAINTIFF possessed concerning the relationship between Ideal Mortgage and the three entities that were purchasers under the Troubled Asset Sale.

55.     On March 30, 2009 GATEWAY funded the $3.65 million Working Capital Loan by depositing that amount in Ideal Mortgage's checking account maintained at GATEWAY. The money was wired out of that account on order of Ideal Mortgage the following day.

56.     The entities that had contracted to purchase the troubled assets were Cooper Capital, Empower International, and the Steve Menna Group. Each purchaser was to pay to GATEWAY a down payment on the purchase equal to 25% of the purchase price of the Troubled Assets being purchased.  On March 31, 2009, GATEWAY received from Cooper Capital the sum of $1,536,065; from Empower International the sum of $1,230,093, and from the Steve Menna Group the sum of $1,051,729, for a total of $3,817,887 (collectively, the "Round-Trip Wires").

57.     While these amounts were equal to 25% of the total purchase price under the Troubled Asset Sale documents, unbeknownst to PLAINTIFF, the Round-Trip Wires directed GATEWAY to credit the account of Ideal Mortgage at GATEWAY with the wired funds, so that the funds constituting the Round-Trip Wires were the property of Ideal Mortgage, not the property of GATEWAY. The Bank's unforeseeable and illegal diversion of money intended for Ideal facilitated and enabled the Round-Trip Transaction that led to the Bank's eventual investigation by OTS and Federal Prosecutors.  Also unbeknownst to PLAINTIFF until several years after her resignation, GATEWAY treated the Round-Trip Wires as money belonging to GATEWAY, and transferred the $3,817,887 to its own account, thereby converting the funds belonging to Ideal Mortgage. In addition, although the purported basis for making this transfer was to treat the payments as the down payments for the Troubled Assets sales, Gateway never transferred the Troubled Assets that were the subject of the Troubled Assets Sales to any of the three purchasers. Nevertheless, without PLAINTIFF's knowledge or consent, GATEWAY falsely and misleadingly treated the $3,817,887 as an asset of GATEWAY on its financial reporting to the Federal Deposit Insurance Corporation ("FDIC") and OTS/OCC, commencing with its March 31, 2009 financial reports, and reported that it no longer held the Troubled Assets on its books.

58.     PLAINTIFF successfully and competently fulfilled her position as CEO and President of GATEWAY through the latter half of 2008 and 2009, despite being under great physical stress from her illnesses. Following a flare-up of her condition in March 2010,

1   PLAINTIFF was having physical difficulty keeping up with the demands of her position. On

2   several occasions she fainted while at work at the GATEWAY offices.

3        59.    On March 23, 2010 PLAINTIFF called in sick and started on sick leave.

4   PLAINTIFF applied for disability insurance through Social Security and through UNUM,

5   GATEWAY's employee disability insurance carrier. On April 6, 2010 PLAINTIFF began

6   receiving temporary total disability payments.

7        60.    In or about October 2009, the Department of Justice, on behalf of the Department

8   of Housing and Urban Development, sued Michael Ashley and Ideal Mortgage civilly for

9   carrying out a pattern of fraudulent mortgage activities, including false certification of loans as

10  meeting FHA underwriting criteria. In December 2009 the FHA withdrew its approval for

11  obtaining FHA financing from Ideal Mortgage, Lend America and other related entities and Ideal

12  Mortgage stopped issuing new mortgages. On December 29, 2009, GATEWAY recognized Ideal

13  Mortgage as in default on the Working Capital Loan, and pursuant to the terms of the Working

14  Capital Loan Agreement, GATEWAY took $1,809,907 from Ideal Mortgage's curtailment

15  account with GATEWAY as partial repayment of the Working Capital Loan.

16       61.    At approximately the same time as PLAINTIFF first went out on sick leave,

17  representatives of the OTS informed members of the GATEWAY Board of Directors that they

18  had information showing that PLAINTIFF had conspired with Michael Ashley and Ideal

19  Mortgage to cause GATEWAY to make the Ideal Mortgage Working Capital Loan and

20  participate in the Troubled Asset Sale knowing that the two transactions had been financed using

21  the Round-Trip Wire money.  The OTS allegation was based upon a forged document dated

22  September 1, 2009 entitled "Confidential Acknowledgment and Agreement." On information

23  and belief, Plaintiff alleges that the forged document on which the OTS relied in making its

24  allegations against Plaintiff was forged by Robert Savitsky in connection with his representation

25  of Michael Ashley.

26       62.    In response to the OTS allegations against PLAINTIFF, the GATEWAY Board,

27  including Defendants WANG and FENTRISS, tabled any action regarding the allegation of

28  misconduct pending an internal investigation to be conducted by Board member Tim Anonick.

63.     On March 25, 2010, Defendant WANG sent a letter to OTS falsely stating that PLAINTIFF had been suspended without pay, although GATEWAY never suspended her and continued to pay PLAINTIFF her salary through May 26, 2010.

64.     On May 25, 2010, Defendant WANG sent a letter to Michael Kenny informing Kenny that he had been terminated from his position at GATEWAY effective May 25, 2010, stating that the investigation by the Board of Directors into the Round Trip Transaction had determined that Kenny was directly responsible for a loss to GATEWAY of $3.6 Million and that Kenny had breached his duty of loyalty to the bank and acted for his personal benefit, directing business away from GATEWAY.

65.     At no time was Plaintiff ever informed by or on behalf of the GATEWAY Board of Directors that the investigation by the Board of Directors into the Round-Trip Transaction had determined that Plaintiff's performance was deficient with respect to the transaction. The first time Plaintiff learned of any of the contents of the report by Anonick to the Board on his investigation into the Round-Trip transactions was in late 2016 when a partially redacted copy of the Anonick report was produced by GATEWAY in discovery in the State Court Action.

66.     On May 26, 2010, PLAINTIFF submitted a letter of resignation to the GATEWAY Board of Directors. At the monthly GATEWAY Board of Directors meeting on May 27, 2010, Tim Anonick presented the report of his investigation of PLAINTIFF's involvement in the Ideal Mortgage Round Trip Transaction. At the same meeting, the Board formally unanimously accepted PLAINTIFF's resignation without either terminating PLAINTIFF, taking any action pursuant to Section 3.2 of the SERP PLAN, or terminating the SERP PLAN. Following the Board's acceptance of her resignation, Defendant WANG sent to PLAINTIFF flowers and a letter of appreciation for her work.

67.     At no time did the Board of Directors of GATEWAY ever terminate PLAINTIFF's employment. At no time during or after PLAINTIFF's employment terminated in May of 2010, until at least February of 2016, was PLAINTIFF ever advised by anyone claiming to speak for GATEWAY, that PLAINTIFF's "employment performance is no longer at a level which deserves reward through participation in [the SERP PLAN]" as provided for in Section

3.2 of the SERP PLAN. At no time did the Board of Directors of GATEWAY ever terminate the SERP PLAN under Section 9.1 of the SERP PLAN. At no time until at least February of 2016 was Plaintiff ever informed that GATEWAY was taking the position that Plaintiff was not entitled to her accrued benefits under the SERP PLAN.

68.     At no time prior to February 26, 2016, after PLAINTIFF had reached her SERP PLAN "Retirement Age" and after submitting a claim for benefits under her SERP PLAN, did GATEWAY or anyone acting on its behalf ever notify PLAINTIFF that GATEWAY contended that the GATEWAY Board of Directors had either "terminated" PLAINTIFF, determined PLAINTIFF had been subject to a "change in employment status" per Section 3.2 of the SERP PLAN, or that PLAINTIFF's SERP PLAN had been terminated.

69.     On March 25, 2013, PLAINTIFF submitted a claim for benefits under the SERP PLAN to the SERP Administrative Committee.

70.     On April 20, 2013, PLAINTIFF turned sixty years of age, her retirement age under the SERP PLAN as modified by the Split Dollar Endorsement.

71.     Sometime during the latter part of 2013 and the first quarter of 2014 the United States Attorney for the Eastern District of New York convened a grand jury seeking indictments of, among others, PLAINTIFF, in connection with the Round-Trip Transaction.

72.     On March 31, 2014, the grand jury issued a criminal indictment against PLAINTIFF based upon her alleged participation in the Round-Trip Transaction.

73.     On April 30, 2015 Plaintiff, acting on advice of counsel, entered into a plea agreement with the United States, agreeing to plead guilty to one count of conspiracy to commit bank fraud . She subsequently entered a plea of guilty in her criminal proceeding. At the time of her plea, the applicable law in the Second Circuit held that the government was required to prove that a defendant charged under 18 U.S.C. § 1344 "intended to victimize the bank by exposing it to an actual or potential loss." (*United States v. Rodriguez* (2nd Cir. 1998) 140 F.3rd 163, 168.) Defendants' false statements to FBI investigators and Assistant United States Attorneys that GATEWAY had suffered millions of dollars in damages because of the Round-Trip Transaction were a substantial factor in PLAINTIFF's decision to agree to enter a guilty plea.

74.     On July 2, 2015 GATEWAY filed suit against PLAINTIFF in San Mateo Superior Court CIV 534510 seeking damages it allegedly suffered as a result of the Round-Trip Transaction (the "State Court Action").  GATEWAY made no claim in the State Court Action relating to PLAINTIFF's rights under the SERP PLAN.

75.     Plaintiffs claim for SERP benefits was initially denied on February 26, 2016 by an "Administrative Committee" purportedly appointed by the GATEWAY Board of Directors and her appeal of that denial was denied by an "Appeals Committee" conducting a "*de novo*" review in March of 2017. Plaintiff was given notification of that denial on May 22, 2017.

C.   Defendants' Wrongful Abstraction and Misappropriation of PLAINTIFF'S SERP PLAN Assets to Falsely Inflate GATEWAY's Capital, Deceive Federal Regulators as to the Bank's Capital Ratios and Preventing Plaintiff from Establishing Her Right to SERP Benefits

76.     At a meeting of the GATEWAY Board of Directors on March 23, 2010 Defendants WANG, FENTRISS, and James Baxter were appointed to a newly established "Office of Chief Executive Officer" with the responsibility of jointly overseeing the day-to-day operations of GATEWAY.  Defendant WANG was at this time GATEWAY's largest shareholder, while Defendant FENTRISS was a shareholder and a co-owner of  Community Bank Investors of America ("CBIA"), which also was a significant shareholder in GATEWAY.

77.     As of March 31, 2010, GATEWAY's performance was failing the mandate of the 2009 OTS Consent Order requiring minimum Core Capital of 7% and minimum Risk Based Capital of 14% at all times. GATEWAY was required to report a statement of its assets and liabilities to the FDIC within 45 days of March 31, 2010. If GATEWAY had reported its true assets and liabilities as of March 31, 2010, GATEWAY would have been deemed by OTS as either "Significantly" or "Critically Under Capitalized." A determination by OTS that GATEWAY had failed to maintain its mandated capital levels was likely to result in the FDIC cancelling GATEWAY's deposit insurance, forcing the bank to close, or take action to replace GATEWAY's officers and/or directors. In order to avoid such action by OTS and/or the FDIC, Defendants WANG and FENTRISS would have had to either contribute additional capital to

GATEWAY or seek capital contributions from outside parties that would have diluted their percentage ownership in GATEWAY.

78.     PLAINTIFF is informed and believes, and on that basis alleges, that, on April 20, 2010, in order to avoid reporting to OTS that as of March 31, 2010 GATEWAY had failed to meet minimum capital requirements, Defendant GREEN, with the knowledge and concurrence of James Baxter and Defendants FENTRISS and WANG, and knowing of the existence of GATEWAY's obligations to pay PLAINTIFF her SERP benefits, intentionally interfered with PLAINTIFF's rights to receive benefits under the SERP and falsely eliminated GATEWAY's SERP PLAN liability of $1,236,448.04 as of March 31, 2010, thereby committing a violation of 18 U.S.C § 664.  Defendant GREEN did this without presenting this action to the full Board of Directors and in the absence of any decision by the GATEWAY Board of Directors to deny PLAINTIFF her accrued SERP PLAN benefits or terminate PLAINTIFF's SERP PLAN. The unauthorized and illegal removal of GATEWAY's liability to PLAINTIFF's SERP PLAN resulted in GATEWAY falsely reporting to OTS that as of March 31, 2010 the BANK's net assets and capital were $1,851,000 greater than they actually were. By virtue of falsely reporting the inflated net capital figure, GATEWAY met its minimum Core Capital Requirement for March 31, 2010, which was sufficient to avoid a downgrading of its status.

79.     Defendant GREEN falsely and corruptly inflated GATEWAY's assets and capital as of March 31, 2010 by abstracting the SERP PLAN asset represented by GATEWAY's liability to the SERP PLAN thereby violating 18 U.S.C. § 664.

80.     Henceforth, on a quarterly basis, Defendant GREEN, until he left GATEWAY in October 2013, Defendant FENTRISS until he left the Board of Directors in 2012, Defendant WANG, until he left the Board of Directors in 2016, and James Baxter, until his death in 2014, caused GATEWAY to routinely transmit by United States mail and/or domestic wire its financial statements to the FDIC and OTS/OCC falsely representing that it had at least over $1.85 Million in assets representing the NEW YORK LIFE POLICY cash value while abstracting its liability to PLAINTIFF's SERP PLAN in an equivalent amount, knowingly interfering with PLAINTIFF's right to receive benefits under the SERP.

81.     Commencing on or about May 15, 2010 and until his termination from GATEWAY ON October 22, 2013, Defendant GREEN as CFO of GATEWAY signed off on financial reports of GATEWAY to the FDIC and OTS/OCC falsely representing that GATEWAY had no existing liability to PLAINTIFF's SERP PLAN, despite GATEWAY's Board of Directors having never terminated PLAINTIFF, having never determined that PLAINTIFF's right to the SERP benefits which she had paid for should be terminated, and having never terminated the SERP PLAN itself. This false report was transmitted from GATEWAY to the OTS/OCC by transmission over interstate wires through the internet and on information and belief, by United States mails, affecting interstate commerce. These transmissions were intended to, and did, cause the FDIC and  OTS/OCC to rely upon the false information in making decisions regarding the continued operations of GATEWAY and the composition of its management and Board of Directors, all in violation of 18 U.S.C §§ 1341 and 1343.

82.     On or about August of 2010, Defendants GREEN, WANG, and FENTRISS, along with James Baxter, caused GATEWAY to falsely report to OTS an inflated net capital figure that abstracted GATEWAY's liability to PLAINTIFF's SERP PLAN in an amount in excess of $1.8 Million. By reason of this falsely inflated net capital reporting, GATEWAY again met its minimum Core Capital Requirement for June 30, 2010.

83.     From on or about August 15, 2010, thereafter until he left GATEWAY in October 2013, on a quarterly basis Defendant GREEN violated 18 U.S.C. §§ 1341 and 1343 by sending the FDIC and OTS/OCC by interstate wire and, on information and belief, by United States mails, GATEWAY financial statements and information omitting the GATEWAY liability to PLAINTIFF's SERP PLAN. These transmissions were intended to, and did, cause the FDIC and OTS/OCC to rely upon the false information in making decisions regarding GATEWAY'S compliance with capital requirements,  the continued operations of GATEWAY, and the composition of its management and Board of Directors.

D.     Defendants' Actions to Coverup Their Misappropriation of PLAINTIFF's SERP PLAN Asset and Other Misappropriated Assets by Making False Statements to

Government Regulators, Federal Law Enforcement, and the Federal Court Designed to Promote the Criminal Prosecution of PLAINTIFF

84.     Following the abstraction of the SERP Plan asset and the elimination from GATEWAY's books of its SERP liability to Plaintiff, and its subsequent false reporting of its financial condition to the FDIC and  OTS/OCC, Defendants GREEN, CHEUNG, KEEFE, FENTRISS, LEE, THUKRAL, and McKINNEY each participated in one or more predicate acts for the purposes (a) intentionally interfering with PLAINTIFF's right to receive benefits under the SERP, (b) continuing to mislead the FDIC and OTS/OCC as to the true financial condition of GATEWAY, and (c) to encourage and support the Federal Government's criminal prosecution of Plaintiff for the Round Trip Transaction in order to inhibit or prevent her successfully pursuing her claim to benefits under the SERP.

85.     At all times Defendant GREEN was aware that PLAINTIFF had never been terminated, had been permitted to resign, and that she had a valid claim for receiving SERP benefits despite GREEN's actions to falsely deny GATEWAY's liability to the SERP PLAN in April of 2010. GREEN and other Defendants undertook a series of actions calculated to encourage the criminal prosecution of Plaintiff for the Round-trip Transaction in order to divert attention from GATEWAY's misappropriation of the SERP PLAN asset and the $3,817,887 belonging to Ideal Mortgage that GATEWAY had converted to its own use.

86.     On November 4, 2010, Defendant GREEN caused GATEWAY to restate its financial statements to reverse the treatment of the Troubled Asset Sales by returning to its books for years ending June 30, 2009 and June 30, 2010 the Troubled Assets that were the subject of the Troubled Assets Sales and had never been transferred to the purchasers, and by reversing the Working Capital Loan to Ideal Mortgage. The restated financials did not return the $3,817,887 to the Ideal Mortgage checking account nor did it characterize or report that sum as an amount due to Ideal Mortgage.

87.     Defendant GREEN's November 4, 2010 restatement of the GATEWAY financial statements to reflect the reversal of the Troubled Asset Sale without taking steps to treat the money from the Round-Trip Wires as the rightful property of the bankrupt Ideal Mortgage was a

financial transaction involving the proceeds from specified unlawful activity (18 U.S.C. § 1006) in violation of 18 U.S.C. §§ 1956 and 1957.

88.     On November 30, 2010 an involuntary petition in bankruptcy was filed in the Eastern District of New York against Ideal Mortgage. The petition was granted, and a Chapter 7 Bankruptcy proceeding ensued. On December 21, 2011, Kenneth Barnard ("Barnard"), the appointed trustee for Ideal Mortgage in the Chapter 7 Bankruptcy, initiated an adversary proceeding against, *inter alia* GATEWAY, Steve Menna Group, Empower International, and Robert Savitsky. On December 13, 2013, Barnard filed an amended complaint in the adversary proceeding alleging, *inter alia,* that GATEWAY had entered into the Confidential Acknowledgment and Agreement on September 1, 2009. In an answer filed on January 1, 2014, GATEWAY expressly denied the allegation, alleging further that "Gateway lacks knowledge or information sufficient to form a belief as to the truth of the allegations that Poppi Metaxas purported to enter into the "Gateway Acknowledgement" with the Debtor in September 2009."

89.     On June 15, 2011 Defendant GREEN was interviewed by agents of the Federal Bureau of Investigation investigating criminal conduct connected with the operation of Ideal Mortgage, including PLAINTIFF's role in the Round-Trip Transaction. Plaintiff is informed and believes, and upon that basis alleges, that in the interview, GREEN made no mention of GATEWAY's restatement of its financials for June 30, 2009 or June 30, 2010, its retention of the $3,817,887 for its own account, or its abstraction of the SERP PLAN asset as of March 31, 2010, but falsely represented that GATEWAY had been damaged by the Round-Trip Transaction in the amount of $5,407,000, when GATEWAY's books now showed that it had profited from the Round-Trip Transaction through the misappropriation of the $3,817,887 and the reversal of the Troubled Asset Sale, as well as the abstraction of the SERP PLAN asset. Defendant GREEN's false and misleading statements in his June 15, 2011 interview constituted violations of 18 U.S.C. 1503.

90.     From October 22, 2013, if not earlier, Defendants KEEFE and CHEUNG knew that PLAINTIFF had never been terminated and that GATEWAY had a liability to

PLAINTIFF's SERP PLAN for several million dollars, when they were so informed by Defendant GREEN.

91.     From on or about November 15, 2013, if not earlier, until Defendant CHEUNG ceased to serve as Chief Executive Officer and a member of the Board of GATEWAY, which PLAINTIFF is informed and believes was sometime in 2016, Defendant CHEUNG authorized and approved the submission of financial information and statements to the FDIC and OTS/OCC falsely omitting GATEWAY's liability to PLAINTIFF's SERP PLAN, transmitting such false information to the FDIC and OTS/OCC via interstate wires and, on information and belief, by United States mails, in the course of interstate commerce, in violation of 18 U.S.C. §§ 1341 and 1343. These transmissions were intended to, and did, cause OCC to rely upon the false information in making decisions regarding the continued operations of GATEWAY and the composition of its management and Board of Directors.

92.     From on or about August 2014 Defendant KEEFE, and from on or about March 2015 Defendant LEE each authorized and approved the submission of financial information and statements to the FDIC and OTS/OCC falsely omitting GATEWAY's liability to PLAINTIFF's SERP PLAN, transmitting such false information to the FDIC and OTS/OCC via interstate wires and, on information and belief, by United States mails, in the course of interstate commerce, in violation of 18 U.S.C. §§1341 and 1343. These transmissions were intended to, and did, cause the FDIC and OTS/OCC to rely upon the false information in making decisions regarding the continued operations of GATEWAY and the composition of its management and Board of Directors.

93.     On a quarterly basis, Defendants GREEN and CHEUNG, during the periods they held their positions as CFO and CEO respectively, falsely omitted GATEWAY's liability to PLAINTIFF's SERP PLAN and  falsely characterized the money from the Round-Trip Wires as an asset of GATEWAY and not the property of the bankrupt Ideal Mortgage, transmitting such false information to the FDIC and OTS/OCC via interstate wires and, on information and belief, by United States mails, in the course of interstate commerce, in violation of 18 U.S.C. §§1341 and 1343. These transmissions were intended to, and did, cause the FDIC and OTS/OCC to rely

upon the false information in making decisions regarding the continued operations of GATEWAY and the composition of its management and Board of Directors.

94.     On June 3, 2013, Defendant GREEN gave a second interview with agents of the Federal Bureau of Investigation. Plaintiff is informed and believes, and upon that basis alleges, that in the second interview, GREEN made no mention of GATEWAY's restatement of its financials for June 30, 2009 or June 30, 2009, its retention of the $3,817,887 for its own account, or its abstraction of the SERP PLAN asset as of March 31, 2010. GREEN indicated he could not tell whether the Working Capital Loan and the Troubled Asset Sales were a Round-Trip Transaction, but falsely stated that if they were, Plaintiff's actions had damaged GATEWAY by approximately $7.7 Million. GREEN falsely stated that Plaintiff had been "fired" by GATEWAY. Defendant GREEN's false statements constituted a violation of 18 U.S.C. § 1503.

95.     On November 18, 2014, Defendant GREEN was interviewed a third time by agents for the Federal Bureau of Investigation and assistant United States Attorneys for the Eastern District of New York. Plaintiff is informed and believes, and on that basis alleges, that in this third interview GREEN was questioned concerning PLAINTIFF's participation in the Round-Trip Transaction and its impact upon GATEWAY. GREEN falsely told the FBI agents and Assistant United States Attorneys that on March 22, 2010 PLAINTIFF had said to GREEN that she believed she was about to be fired. Defendant GREEN's false statements constituted a violation of 18 U.S.C. §§ 1503 and 1512.

96.     Defendant Keefe continues to serve as Chairman of the Board of GATEWAY, and as such continues to authorize and ratify GATEWAY filing on a quarterly basis financial reports with the FDIC and OTS/OCC containing false financial statements in that the filings fail to reflect the money from the Round-Trip Wires as the property of the bankrupt Ideal Mortgage also falsely omit GATEWAY's liability to PLAINTIFF's SERP PLAN, constituting violations of 18 U.S.C. §§ 1341 and 1343.  Absent enforcement by this Court, Defendant KEEFE will continue to authorize and ratify the filing of false quarterly reports with the FDIC and OTS/OCC misrepresenting the assets and liabilities of GATEWAY as to GATEWAY's liability to PLAINTIFF'S SERP PLAN and GATEWAY'S wrongful conversion of the money from the

Round-Trip Wires into the indefinite future, and will, on a quarterly basis, commit violations of 18 U.S.C. §§ 1341 and 1343.

97.     In connection with PLAINTIFF's criminal sentencing proceedings, on November 23, 2015, Defendant KEEFE signed an affidavit filed with the Eastern District of New York falsely stating that due to PLAINTIFF's actions in connection with the Round-Trip Transaction GATEWAY had suffered $13,755,166 in losses. Defendant KEEFE's false statements in the affidavit constituted a violation of 18 U.S.C. §§ 1503 and 1512.

98.     In connection with PLAINTIFF's criminal sentencing proceedings, on December 18, 2015, Defendant KEEFE signed a second affidavit filed with the Eastern District of New York this time falsely stating that due to PLAINTIFF's actions in connection with the Round-Trip Transaction GATEWAY had suffered $6,212,773.23 in losses. Defendant KEEFE's false statement in the affidavit constituted a violation of 18 U.S.C. § 1503 and 1512.

99.     On November 12, 2014 Defendant FENTRISS was interviewed by agents for the Federal Bureau of Investigation and assistant United States Attorneys for the Eastern District of New York conducting their investigation into the Round-Trip transaction and PLAINTIFF's involvement in that transaction.  Plaintiff is informed and believes, and upon that basis alleges, that in the interview FENTRISS falsely stated to the FBI agents and United States Attorneys that PLAINTIFF had been "fired" by GATEWAY. FENTRISS' false statement constituted a violation of 18 U.S.C. §§ 1503 and 1512.

100.     On February 25, 2016, a purported SERP Administrative Committee, consisting of Defendants LEE, KEEFE, and Frances Baker, the Oakland Branch Manager denied PLAINTIFF's claim on the basis of knowingly false and misleading statements, including that that the GATEWAY Board of Directors had made a determination prior to the submission of her claim that PLAINTFF's "employment performance at Gateway was not at a level that deserves reward through the SERP; that PLAINTIFF was not disabled at the time she ceased working;" that PLAINTIFF was not disabled within the meaning of the SERP PLAN at the time she took medical leave; and that GATEWAY did not, at the least, owe PLAINTIFF her "accrued benefits" as of her date of resignation on May 26, 2010. Defendants LEE and KEEFE knew, at the time

they signed off on the determination, that there was no factual basis for these assertions and that GATEWAY continued to have a liability to PLAINTIFF's SERP PLAN, but issued the denial in order to intentionally interfere with Plaintiff's contractual right to have GATEWAY pay her her SERP Benefits.  Plaintiff currently lacks knowledge as to the specific persons to whom the denial was transmitted and the manner of such transmission, but Plaintiff is informed and believes that the Defendants' LEE and KEEFE knew and understood that their determination, including the false statements contained therein would be transmitted to various persons through the use of the United States Mail and/or interstate wires, and that it was intended that such persons would rely upon the determination as evidence supporting the false financial statements of GATEWAY purporting to show that GATEWAY had no SERP liability to Plaintiff. The submission of the SERP benefits determination to various persons stating false information via interstate wires and/or by United States mails, in the course of interstate commerce constituted a violation of 18 U.S.C. §§1341 and 1343.

101.   On May 22, 2016, PLAINTIFF appealed the denial of her claim. On March 23, 2017, the appeals committee, consisting of Defendants MCKINNEY, MADDEN, and THUKRAL, carrying out a "de *novo*" review of PLAINTIFF's claim for benefits under the SERP PLAN, denied PLAINTIFF's appeal of her SERP PLAN benefits claim. PLAINTIFF was notified of the denial of her appeal on May 22, 2017. Plaintiff is informed and believes, and on such basis alleges, that Defendants MCKINNEY, MADDEN, and THUKRAL knew and intended that their written decision would be transmitted to PLAINTIFF and/or her legal counsel through the United States Mails and/or interstate wires. Defendants MCKINNEY, MADDEN, and THUKRAL, knew that the following statements in their decision were false, or alternatively, knew that they lacked any evidentiary basis for the statements but made them in reckless disregard for the truth of the matters they stated:

a.   Ms. Metaxas …organized sham transaction to make it appear that Gateway's NPA and REO were sold at inflated prices [referring to the prices for the assets sold in the Troubled Asset Sale]; [page 2]

1      b.    PLAINTIFF "made false and misleading statements to Gateway's Board of Directors (the "Board") regarding the business purposes of the transactions, to induce the Board to approve them; [page 2]

c.    "[PLAINTIFF] … was fired for cause pursuant to Section 3.4 of the SERP prior to her alleged resignation." [p. 8]

102.    PLAINTIFF is informed and believes, and upon such basis alleges, that the May 22, 2017 determination of the appeals committed is also false in that in it Defendants MCKINNEY, MADDEN, and THURKAL represent that the content of the determination constituted their own independent determination of the facts relating to PLAINTIFF's right to benefits under her SERP PLAN, when the determination, including its supporting facts and analysis, was prepared at the direction of Defendant KEEFE and submitted to Defendants MCKINNEY, MADDEN, and THUKRAL to sign as written and prepared, and the determination does not represent a *de novo* review independently made by Defendants MCKINNEY, MADDEN, and THUKRAL.

103.    The actions of Defendants KEEFE, MCKINNEY, MADDEN, and THUKRAL caused the determination of the appeals committee on PLAINTIFF's appeal of the denial of her SERP benefits to be transmitted on May 22, 2017 by use of the United States Mails and/or interstate wires to PLAINTIFF and/or her counsel, which determination contained false and misleading statements known to be false to the participating Defendants and/or sent with reckless disregard for the truth or falsity of the statements in the determination, in violation of 18 U.S.C. §§1341 and 1343.

104.    On May 4, 2017 PLAINTIFF filed a petition under 28 USC § 2255 to overturn her guilty plea and conviction and for dismissal of the charges or trial on any remaining charges, on grounds of ineffective assistance of counsel. After several rounds of briefing, PLAINTIFF's Motion is scheduled for an evidentiary hearing on August 7, 2019.

**FIRST CLAIM FOR RELIEF**

**[18 USC 1962(c)]**

Defendants: ALL

105.    PLAINTIFF incorporates Paragraphs 1 through 104 into this First Claim for Relief.

106.    GATEWAY is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

107.    The Defendants WANG, FENTRISS, GREEN, LEE, KEEFE, CHEUNG, MCKINNEY, MADDEN, and THUKRAL are each a "person" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

108.    GATEWAY is an "enterprise" within the meaning of 18 U.S.C. 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

109.    The Defendants WANG, FENTRISS, GREEN, LEE, KEEFE, CHEUNG, were each employed by or associated with an enterprise, that is GATEWAY, and did conduct or participate, directly or indirectly, in the conduct of the of the affairs of GATEWAY through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1962(c), including, to wit:

a.   Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;

b.   Multiple instances of wire fraud in violation of 18 U.S.C § 1343;

c.   One or more Instances of theft, embezzlement, or abstraction from a pension or employee benefit fund in violation of 18 U.S.C. § 664;

d.    Multiple instances of corruptly influencing, obstructing, and/or impeding the investigation of criminal activity and a criminal court proceeding in violation of 18 U.S.C. § 1503 and obstructing an official proceeding in violation of 18 U.S.C. § 1512.

110.    Predicate Activity listed by Defendant

a.   Defendant LEE

(1)    From about March 2015, in the conduct of the affairs of the enterprise, GATEWAY, LEE caused the transmission of false information to the FDIC and OTS/OCC via the mails and by interstate wiring by falsely omitting Gateway's liability to Plaintiffs SERP Plan thereby

proximately and directly causing injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of Plaintiff's injury, and there was a direct relationship between the injury and the injurious conduct, all in violation of 18 U.S.C. §§ 1341 and 1343;

(2)     During his service as CFO, in the conduct of the affairs of the enterprise, Gateway, from March 2015 through the end of year 2016, Defendant LEE, with defendant KEEFE, on a quarterly basis, caused to be filed with the FDIC and OTS/OCC, by wire and mail,  false financial statements for GATEWAY which failed to reflect the money from the Round-Trip Wires as the property of the bankrupt Ideal Mortgage, and falsely omitted GATEWAY's liability to PLAINTIFF's SERP PLAN, (see ¶ 92), all proximately causing injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of Plaintiff's injury, and there was a direct relationship between the injury and the injurious conduct, all constituting violations of 18 U.S.C. §§ 1341 and 1343;

(3)     On February 25, 2016, LEE, as a member of a purported SERP Administrative Committee, with others, in the conduct of the affairs of the enterprise, Gateway, denied PLAINTIFF's claim under the SERP, on the basis of knowingly false and misleading statements, *i.e*., Defendant LEE, with KEEFE knew, at the time they signed off on the determination that there was no factual basis for these assertions and the U.S. mails or wires would be used (see § 97). Plaintiff currently lacks knowledge as to the specific persons to whom the denial was transmitted and the manner of such transmission, but Plaintiff is informed and believes that Defendants LEE knew and understood that the determination, including the false statements contained therein would be transmitted to various persons

through the use of the United States Mail and/or interstate wires, and that it was intended that such persons would rely upon the determination as evidence supporting the false financial statements of GATEWAY purporting to show that GATEWAY had no SERP liability to Plaintiff. The submission of the SERP benefits determination to various persons stating false information via interstate wires and/or by United States mails, in the course of interstate commerce constituted a violation of 18 U.S.C. §§1341 and 1343 and directly and proximately caused injury to Plaintiff's business and property as there was a direct relationship between the injury asserted and the injurious conduct.

(4) **Closed-Ended Continuity**-   LEE's predicate activity was related to the affairs of the Enterprise, and continued for the entire time he served as the CFO of Gateway, over 21 months, and thus constituted a substantial period of time to satisfy the closed-ended continuity requirement for a pattern of racketeering activity.

b.    Defendant GREEN

(1)    Defendant GREEN, on April 20, 2010, with the knowledge and concurrence of others, in the conduct of the affairs of the enterprise falsely eliminated GATEWAY's SERP PLAN liability to Plaintiff of $1,236,448.04 as of March 31, 2010, (see ¶¶ 77-78).   GREEN thereby violated 18 U.S.C. § 664, a RICO predicate proscribing the unlawful embezzling, stealing, abstraction, or conversion of assets of any employee benefit plan subject to Title I of ERISA, or any fund connected therewith, thereby directly and proximately causing injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury and the injurious conduct;

(2)     Defendant GREEN, until he left GATEWAY in October 2013, from April 2010 to that date, caused GATEWAY to routinely transmit by United States mail and/or domestic wire its financial statements to the FDIC and OTS/OCC falsely representing that it had at least over $1.85 Million in assets representing the NEW YORK LIFE POLICY cash value while abstracting its liability to PLAINTIFF's SERP PLAN in an equivalent amount (see ¶ 79); thereby directly and proximately causing injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury and there was a direct relationship between the injury and the injurious conduct as such false statements would be reasonably be anticipated to be used as a basis for the latter denial of SERP benefits, all of which constituted violations of 18 U.S.C. §§1341 and 1343;

(3)     Commencing on or about May 15, 2010, Defendant GREEN as CFO and until his termination from GATEWAY on October 22, 2013, signed off on financial reports of GATEWAY to the FDIC and OTS/OCC falsely representing that GATEWAY had no existing liability to PLAINTIFF's SERP PLAN (para. 80), which reports were transmitted from GATEWAY to the OTS/OCC by transmission over the interstate wires through the internet.   These mailings and/or wirings were intended to, and did, cause the FDIC and  OTS/OCC to rely upon the false information in making decisions regarding the continued operations of GATEWAY and the composition of its management and Board of Directors, and directly and proximately causing injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury and the injurious conduct as such false reports would be reasonably be anticipated to be used as a basis for the latter denial of

SERP benefits, all of which constituted violations of 18 U.S.C. §§1341 and 1343;

(4)     On or about August of 2010, Defendant GREEN, along with Defendant WANG and FENTRISS, along with James Baxter, caused GATEWAY to falsely report to OTS, by use of the mails and wires an inflated net capital figure that abstracted GATEWAY's liability to PLAINTIFF's SERP PLAN in an amount in excess of $1.8 Million, (see ¶ 81-82), thereby directly and proximately causing injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury and the injurious conduct as such false reports would be reasonably be anticipated to be used as a basis for the latter denial of SERP benefits, all of which constituted violations of 18 U.S.C. §§1341 and 1343;

(5)     On or about November 4, 2010, Defendant GREEN caused a restatement of GATEWAY's financial statements reversing the Troubled Asset Sale in which GATEWAY had illegally and fraudulently converted the down payments to its own account but held the money GATEWAY had claimed as the down payments for the Troubled Asset Sale in an account for GATEWAY. GREEN's actions constituted a financial transaction involving the proceeds from specified unlawful activity (18 U.S.C. § 1006) in violation of 18 U.S.C. §§ 1956 and 1957.

(6)     On June 15, 2011 Defendant GREEN was interviewed by agents of the Federal Bureau of Investigation investigating criminal conduct connected with the operation of Ideal Mortgage, including PLAINTIFF's role in the Round-Trip Transaction. Plaintiff is informed and believes, and on such basis alleges, that in the interview, GREEN made no mention of various facts (see ¶ 88) and made false statements that

GATEWAY had been damaged by the Round-Trip Transaction in the amount of $5,407,000. Defendant GREEN's false and misleading statements in his June 15, 2011 interview constituted violations of 18 U.S.C. § 1503 by impeding the due administration of justice,  proximately causing injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury and the injurious conduct as such false statements would be reasonably be anticipated to be used as a basis for the latter denial of SERP benefits;

(7)     On June 3, 2013, Defendant GREEN gave a second interview with agents of the Federal Bureau of Investigation. Plaintiff is informed and believes, and on that basis alleges, that in the interview Defendant GREEN intentionally omitted financial information (see ¶ 93) including its abstraction of the SERP PLAN asset as of March 31, 2010. GREEN also falsely stated that Plaintiff had been "fired" by GATEWAY, Defendant GREEN's false statements constituted a violation of 18 U.S.C. § 1503 and proximately caused injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury and the injurious conduct, as such false statements would be reasonably be anticipated to be used as a basis for the latter denial of SERP benefits;

(8)     On November 18, 2014, Defendant GREEN was interviewed again by agents for the Federal Bureau of Investigation and assistant United States Attorneys for the Eastern District of New York. Plaintiff is informed and believes, and on such basis alleges, that in this third interview Defendant GREEN was questioned concerning PLAINTIFF's participation in the Round-Trip Transaction and its impact upon GATEWAY (see ¶.94).  GREEN falsely told the FBI agents and

Assistant United States Attorneys that on March 22, 2010 PLAINTIFF had said to GREEN that she believed she was about to be fired. Defendant GREEN's false statements constituted a violation of 18 U.S.C. §§ 1503 and 1512 and proximately caused injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct,.

(9)    **Closed-Ended Continuity**- GREEN's predicate activity was related to the affairs of the Enterprise, and continued for the entire time he served as the CFO of Gateway, over 3 ½ years, and thus the predicate activity constituted a substantial period of time to satisfy the closed-ended continuity requirement for a pattern of racketeering activity.

c.    Defendant WANG

(1)    On March 25, 2010, Defendant WANG sent a letter by U.S. mails to OTS falsely stating that PLAINTIFF had been suspended without pay, although GATEWAY never suspended her and continued to pay PLAINTIFF her salary through May 26, 2010 (see ¶ 63).   This use of the mails was in furtherance of the scheme to defraud Plaintiff and directly and proximately causing injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct as such "suspension without pay" was to be reasonably be anticipated to be used as a basis for the latter denial of SERP benefits, all of which constituted violations of 18 U.S.C. §§1341;

(2)    On April 20, 2010, Defendant WANG, concurred with GREEN, (see ¶ 77), and others to falsely eliminate GATEWAY's SERP PLAN liability of $1,236,448.04 as of March 31, 2010.   The unauthorized removal of liability by WANG,  GREEN and others violated 18 U.S.C. §

664, a RICO predicate proscribing the unlawful embezzling, stealing, abstraction, or conversion of assets of any employee benefit plan subject to Title I of ERISA, or any fund connected therewith.  This directly and proximately caused injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury and there was a direct relationship between the injury asserted and the injurious conduct;

(3)     Henceforth, on a quarterly basis, Defendant WANG, until he left the Board of Directors in 2016, with others, caused GATEWAY to routinely transmit by United States mail and/or domestic wire its financial statements to the FDIC and OTS/OCC falsely representing that it had at least over $1.85 Million in assets representing the NEW YORK LIFE POLICY cash value while abstracting its liability to PLAINTIFF's SERP PLAN in an equivalent amount (see ¶ 79).  This thereby directly and proximately caused injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct as such false statements would be reasonably be anticipated to be used as a basis for the denial of SERP benefits, all of which constituted violations of 18 U.S.C. §§1341 and 1343;

(4)     On or about August of 2010, Defendant WANG, with others caused GATEWAY to falsely report to OTS an inflated net capital figure that abstracted GATEWAY's liability to PLAINTIFF's SERP PLAN in an amount in excess of $1.8 Million (see ¶ 81).  This thereby directly and proximately causing injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct as such false reports would be

reasonably be anticipated to be used as a basis for the latter denial of SERP benefits, all of which constituted violations of 18 U.S.C. §§1341 and 1343;

(5)    **Closed-Ended Continuity-**  WANG's predicate activity was related to the affairs of the Enterprise, and continued for much of the time he served as the Chairman of the Board of Gateway, *i.e.*, WANG's predicate activities began in year 2010 and continued through December 2016,  and thus the predicate activity constituted a substantial period of time to satisfy the closed-ended continuity requirement for a pattern of racketeering activity.

d.    Defendant CHEUNG

(1)    From on or about November 15, 2013, until Defendant CHEUNG ceased to serve as Chief Executive Officer and a member of the Board of GATEWAY sometime in 2016, Defendant CHEUNG authorized and approved the submission of financial information and statements to the FDIC and OTS/OCC falsely omitting GATEWAY's liability to PLAINTIFF's SERP PLAN, transmitting such false information to the FDIC and OTS/OCC via interstate wires and, on information and belief, by United States mails, in the course of interstate commerce, in violation of 18 U.S.C. §§ 1341 and 1343 (see ¶ 89).  These transmissions were intended to, and did, cause OCC to rely upon the false information in making decisions regarding the continued operations of GATEWAY and the composition of its management and Board of Directors, and directly and proximately caused injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct as such false information would be reasonably be anticipated to be used as a basis for the denial of SERP benefits, which

benefits were denied in February 2016 and May 2017, all of which constituted violations of 18 U.S.C. §§1341 and 1343.   CHEUNG knew, from October 22, 2013, if not earlier, that PLAINTIFF had never been terminated and that GATEWAY had a liability to PLAINTIFF's SERP PLAN for several million dollars, when they were so informed by Defendant GREEN.  (see ¶ 89).

        (2)    **Closed-Ended Continuity** - CHEUNG's predicate activity was related to the affairs of the Enterprise, and continued from November 15, 2013, until Defendant CHEUNG ceased to serve as Chief Executive Officer and a member of the Board of GATEWAY sometime in 2016, and thus the predicate activity constituted a substantial period of time to satisfy the closed-ended continuity requirement for a pattern of racketeering activity.

e.    Defendant FENTRISS  (Director from 1996 -2012, and Shareholder)

        (1)    On April 20, 2010, in order to avoid reporting to OTS that as of March 31, 2010 GATEWAY had failed to meet minimum capital requirements, Defendant FENTRISS concurred with Defendant GREEN's eliminating GATEWAY's SERP PLAN liability of $1,236,448.04 as of March 31, 2010 , which was unauthorized and illegal, and violation of 18 U.S.C. § 664 (see ¶ 77).  This illegal action directly and proximately caused injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct, as such false information would be reasonably be anticipated to be used as a basis for the denial of SERP benefits, which benefits were denied in February 2016 and May 2017;

        (2)    On a quarterly basis, from year 2010, Defendant FENTRISS until he left the Board of Directors in 2012, along with

Defendants GREEN and WANG, caused GATEWAY to routinely transmit by United States mail and/or domestic wire its financial statements to the FDIC and OTS/OCC falsely representing that it had at least over $1.85 Million in assets representing the NEW YORK LIFE POLICY cash value while abstracting its liability to PLAINTIFF's SERP PLAN in an equivalent amount thereby violating 18 U.S.C. §§ 1341 and 1343 (see ¶ 79). This illegal action directly and proximately caused injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct, as such false information would be reasonably be anticipated to be used as a basis for the denial of SERP benefits, which benefits were denied in February 2016 and May 2017. (See also para. 80, false reporting by FENTRISS in August 2010);

(3)     On November 12, 2014 Defendant FENTRISS was interviewed by agents for the Federal Bureau of Investigation and assistant United States Attorneys for the Eastern District of New York conducting their investigation into the Round-Trip transaction and PLAINTIFF's involvement in that transaction. (see ¶ 99) Plaintiff is informed and believes, and on that basis alleges, that in the interview Defendant FENTRISS falsely stated to the FBI agents and United States Attorneys that PLAINTIFF had been "fired" by GATEWAY. FENTRISS' false statement constituted a violation of 18 U.S.C. §§ 1503 and section 1512 and directly and proximately caused injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct, as such false information would

be reasonably be anticipated to be used as a basis for the denial of SERP benefits, which benefits were denied in February 2016 and May 2017;

(4)   **Closed-Ended Continuity** -  FENTRISS' predicate activity was related to the affairs of the Enterprise, and continued from on or about August 2010 throughout his tenure as Director which continued through year 2012, and thus the predicate activity constituted a substantial period of time to satisfy the closed-ended continuity requirement for a pattern of racketeering activity.

f.    Defendant KEEFE

(1)   From October 22, 2013, if not earlier, Defendant KEEFE, with CHEUNG knew that PLAINTIFF had never been terminated and that GATEWAY had a liability to PLAINTIFF's SERP PLAN for several million dollars, when they were so informed by Defendant GREEN (see ¶ 89).  With such knowledge, Defendant KEEFE, From on or about August 2014 (the date he became President and CEO of Gateway, throughout his tenure as President which continued through June 2018), with Defendant LEE, each authorized and approved the submission of financial information and statements to the FDIC and OTS/OCC falsely omitting GATEWAY's liability to PLAINTIFF's SERP PLAN, and falsely stating that the money from the Round-Trip Transaction was an asset of GATEWAY, transmitting such false information to the FDIC and OTS/OCC via interstate wires and, on information and belief, by United States mails, in the course of interstate commerce thereby violation 18 U.S.C. §§ 1341 and 1343 (para. 90).  These transmissions were intended to, and did, cause the FDIC and OTS/OCC to rely upon the false information in making decisions regarding the continued operations of GATEWAY and the composition of its management and Board of Directors, and directly and proximately caused injury to Plaintiff's

business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct as such false information would be reasonably be anticipated to be used as a basis for the denial of SERP benefits, which benefits were denied in February 2016 and May 2017, all of which constituted violations of 18 U.S.C. §§1341 and 1343.

(2)     In connection with PLAINTIFF's criminal sentencing proceedings, on November 23, 2015, Defendant KEEFE signed an affidavit filed with the Eastern District of New York falsely stating that due to PLAINTIFF's actions in connection with the Round-Trip Transaction GATEWAY had suffered $13,755,166 in losses (see ¶ 97). Defendant KEEFE's false statements in the affidavit constituted a violation of 18 U.S.C. §§ 1503 and section 1512 and directly and proximately caused injury to Plaintiff's business and property as this was a substantial factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct, as such false information would be reasonably be anticipated to be used as a basis for the denial of SERP benefits, which benefits were denied in February 2016 and May 2017;

(3)     In connection with PLAINTIFF's criminal sentencing proceedings, on December 18, 2015, Defendant KEEFE signed a second affidavit filed with the Eastern District of New York this time falsely stating that due to PLAINTIFF's actions in connection with the Round-Trip Transaction GATEWAY had suffered $6,212,773.23 in losses (¶ 98). Defendant KEEFE's false statement in the affidavit constituted a violation of 18 U.S.C. §§ 1503 and section 1512 and directly and proximately caused injury to Plaintiff's business and property as this was a substantial

factor in the sequence of responsible causation of the injury, and there was a direct relationship between the injury asserted and the injurious conduct, as such false information would be reasonably be anticipated to be used as a basis for the denial of SERP benefits, which benefits were denied in February 2016 and May 2017;

(4)     On February 25, 2016, Defendant KEEFE, a member of the SERP Administrative Committee, consisting also of Defendant LEE, and Frances Baker, the Oakland Branch Manager denied PLAINTIFF's claim on the basis of knowingly false and misleading statements (see ¶ 100 for false statements), and determined that GATEWAY did not owe PLAINTIFF any accrued benefits under the SERP PLAN.  Defendant KEEFE, with LEE, knew, at the time they signed off on the determination, that there was no factual basis for these assertions and that GATEWAY continued to have a liability to PLAINTIFF's SERP PLAN.  Plaintiff currently lacks knowledge as to the specific persons to whom the denial was transmitted and the manner of such transmission, but Plaintiff is informed and believes that the Defendant KEEFE knew and understood that the determination, including the false statements contained therein would be transmitted to various persons through the use of the United States Mail and/or interstate wires, and that it was intended that such persons would rely upon the determination as evidence supporting the false financial statements of GATEWAY purporting to show that GATEWAY had no SERP liability to Plaintiff. The submission of the SERP benefits determination to various persons stating false information via interstate wires and/or by United States mails, in the course of interstate commerce constituted a violation of 18 U.S.C. §§1341 and 1343, and directly and proximately caused injury to Plaintiff's business and

property as there was a direct relationship between the injury asserted and the injurious conduct.

(5)     Open-Ended Continuity:  Defendant KEEFE has continued to hold the position of Chairman of the Board of Directors of GATEWAY to the present time. In that position, Defendant KEEFE has knowingly authorized and ratified officers of GATEWAY, the identifies of which are currently not known to PLAINTIFF, to continue to hide and obscure the unlawful abstraction of the bank's SERP liability to PLAINTIFF's SERP PLAN and as well as the false and fraudulent conversion of the money from the Round-Trip wires, by filing false and misleading financial statements with the FDIC and OCC, via interstate wires and/or by United States mails, in the course of interstate commerce, constituting ongoing violations of 18 U.S.C. §§1341 and 1343. This continuing pattern of predicate acts is continuing to directly and proximately cause injury to Plaintiff's business and property in that the ongoing false financial reporting (as well as continuing false claims that GATEWAY suffered financial loss as a result of the Round-Trip Transaction impede the due administration of justice and obstruct federal official proceedings. Due to GATEWAY's legal obligation to make ongoing quarterly reports of its financial condition to regulatory authorities, there is a high likelihood that Defendant KEEFE and those under his direction and control, if not interrupted by judicial or administrative action will continue to file false financial reports with the FDIC and OCC indefinitely, in order to preserve Defendants' fictional portrayal of GATEWAY's financial condition and fraud in connection with the obligation to provide Plaintiff's SERP Benefits.

118.    By reason of the violations of 18 U.S.C. § 1962(c) committed by Defendants WANG, FENTRISS, GREEN, LEE, KEEFE, CHEUNG, PLAINTIFF was injured in the denial

of her benefits under her SERP PLAN in an amount in excess of $2,000,000.00, the exact amount to be established at trial of this matter.

119.    PLAINTIFF is informed and believes, and on such basis alleges, that by reason of the violations of 18 U.S.C. § 1962© committed by Defendants FENTRISS, GREEN, and KEEFE, PLAINTIFF was forced to expend substantial sums for legal representation to represent her in criminal proceedings and the State Court Action. PLAINTIFF is not presently able to determine the exact amount of such fees and expenses attributable to Defendants' wrongful conduct, but is informed and believes, and upon such basis alleges that such amounts exceed $2,000,000.

## SECOND CLAIM FOR RELIEF

### [18 USC § 1962(d)]

120.    PLAINTIFF incorporates Paragraphs 1 through  104 into this Second Claim for Relief.

121.    GATEWAY is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

122.    The Defendants WANG, FENTRISS, GREEN, LEE, KEEFE, CHEUNG, MCKINNEY, MADDEN, and THUKRAL are each a "person" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

123.    GATEWAY is an "enterprise" within the meaning of 18 U.S.C. 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

124.    The Defendants WANG, FENTRISS, GREEN, LEE, KEEFE, CHEUNG, MCKINNEY, MADDEN, and THUKRAL were each employed by or associated with an enterprise, that is GATEWAY, and with James Baxter, did conspire to conduct or participate, directly or indirectly, in the conduct of the of the affairs of GATEWAY through a pattern of racketeering activity within the meaning of 1962(c), to wit:

        a.    Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;

        b.    Multiple instances of wire fraud in violation of 18 U.S.C § 1343;

        c.     Multiple instances of theft, embezzlement, or abstraction from a pension or employee benefit fund in violation of 18 U.S.C. § 664;

        d.     Multiple instances of corruptly influencing, obstructing, and/or impeding the investigation of criminal activity and a criminal court proceeding in violation of 18 U.S.C. § 1503 and obstructing official proceedings as prohibited by 18 U.S.C. § 1512

125.    Each RICO conspiracy Defendant intended to further and facilitate the schemes to defraud, which as described in Claim One, would be completed and satisfied by substantive individual RICO Defendants. The agreement of the RICO conspiracy Defendants only to further and facilitate the activities of the substantive defendants, all of whom themselves have agreed to violate RICO, is as follows:

Conspiracy Defendants MCKINNEY, MADDEN, THURKRAL

126.    On May 22, 2016, PLAINTIFF appealed the denial of her claim. On March 23, 2017, the appeals committee, consisting of Defendants MCKINNEY, MADDEN, and THUKRAL, carrying out a "de *novo*" review of PLAINTIFF's claim for benefits under the SERP PLAN, denied PLAINTIFF's appeal of her SERP PLAN benefits claim (see para. 100-102). Defendants MCKINNEY, MADDEN, and THUKRAL determination, including its supporting facts and analysis, was prepared at the direction of Defendant KEEFE and submitted to Defendants MCKINNEY, MADDEN, and THUKRAL to sign as written and prepared, and the determination does not represent a *de novo* review independently made by Defendants MCKINNEY, MADDEN, and THUKRAL. The actions of Defendants KEEFE, MCKINNEY, MADDEN, and THUKRAL caused the determination of the appeals committee on PLAINTIFF's appeal of the denial of her SERP benefits to be transmitted on May 22, 2017 by use of the United States Mails and/or interstate wires to PLAINTIFF and/or her counsel, which determination contained false and misleading statements known to be false to the participating Defendants and/or sent with reckless disregard for the truth or falsity of the statements in the determination, in violation of 18 U.S.C. §§1341 and 1343.

127.    This action evidences that MCKINNEY, MADDEN, and THUKRAL agreed with conspirators to defraud the Plaintiff of business and property, and such conspiracy to defraud did directly and proximately cause injury to Plaintiff's business and property.

128.    By reason of the violation of 18 U.S.C. § 1962(d) committed by Defendants WANG, FENTRISS, GREEN, LEE, KEEFE, CHEUNG, MCKINNEY, MADDEN, and THUKRAL PLAINTIFF was injured in the denial of her benefits under her SERP PLAN in an amount in excess of $2,000,000.00, the exact amount to be established at trial of this matter.

129.    PLAINTIFF is informed and believes, and on such basis alleges, that by reason of the violations of 18 U.S.C. § 1962© committed by Defendants FENTRISS, GREEN, and KEEFE, PLAINTIFF was forced to expend substantial sums for legal representation to represent her in criminal proceedings and the State Court Action. PLAINTIFF is not presently able to determine the exact amount of such fees and expenses attributable to Defendants' wrongful conduct, but is informed and believes, and upon such basis alleges that such amounts exceed $2,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Poppi Metaxas prays as follows:

1.   That judgment be entered against Defendants WANG, FENTRISS, GREEN, LEE, KEEFE, MCKINNEY, MADDEN, and THUKRAL, and each of them, jointly and severally:

        a.    In an undetermined amount not less than Two Million Dollars ($4,000,000.00) upon the First Claim for Relief, for violation of 18 U.S.C. § 1962(c), the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

        b.    In an undetermined amount not less than Two Million Dollars ($4,000,000.00) upon the Second Claim for Relief, for violation of 18 U.S.C. § 1962(d) by conspiracy to violate 18 U.S.C. § 1962(c), the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

        c.    For the costs of suit including reasonable attorney's fees in accordance with 18 U.S.C. § 1964(c).

d.    In addition, PLAINTIFF prays for equitable relief against Defendants in the form of such injunctive and related relief as might be appropriate in accordance with 18 U.S.C. § 1964(a) including:

e.    (i) Reasonable restrictions on the future activities and investments of Defendants.

f.    (ii) For the restatement of the books of account for GATEWAY to properly reflect the GATEWAY liability to PLAINTIFF's SERP PLAN

g.    For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

Dated:  July 1, 2019

LAW OFFICES OF DAVID H. SCHWARTZ, INC.

By: _____*/s/ David H. Schwartz*_____
DAVID H. SCHWARTZ, ESQ.
Attorneys for Plaintiff Poppi Metaxas

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated:  July 1, 2019

LAW OFFICES OF DAVID H. SCHWARTZ, INC.

By: _____*/s/ David H. Schwartz*_____
DAVID H. SCHWARTZ, ESQ.
Attorneys for Plaintiff Poppi Metaxas

APPENDIX A
Wire Fraud (18 U.S.C. § 1341) Predicate Acts
Cognizable as Racketeering Activity
under RICO (18 U.S.C. § 1961(1)(B)

| Representation By | To | Date | Purpose | Complaint ¶ |
|---|---|---|---|---|
| Green | FDIC/OTS/OCC | June 2010 to October 2013 | Mislead Bank Regulators as to GATEWAY's financial condition | 7.b., 7.c., 81- 83, 110.b. |
| Cheung | FDIC/OTS/OCC | June 2010 to 2016 | Mislead Bank Regulators as to GATEWAY's financial condition | 7.c., 91, 93, 110.d. |
| Keefe | FDIC/OTS/OCC | August 2014 to present | Mislead Bank Regulators as to GATEWAY's financial condition | 7.d., 92, 93, 96, 110.f., 126 |
| Wang | FDIC/OTS/OCC | March 2010 to 2016 | Mislead Bank Regulators as to GATEWAY's financial condition | 82, 110.c. |
| Fentriss | FDIC/OTS/OCC | June 2010 to 2012 | Mislead Bank Regulators as to GATEWAY's financial condition | 82, 110.e. |
| Lee | FDIC/OTS/OCC | March 2015 to March, 2017 | Mislead Bank Regulators as to GATEWAY's financial condition | 7.d., 92, 110.a., |
| Keefe | Plaintiff | February 26, 2016 | Create pretext for denial of Plaintiff's SERP benefits | 100, 103 |
| Lee | Plaintiff | February 26, 2016 | Create pretext for denial of Plaintiff's SERP benefits | 100 |
| Thurkal | Plaintiff | May 2 2017 | Create pretext for denial of | 11, 103, 126, 126 |

| | | | Plaintiff's SERP benefits | |
|---|---|---|---|---|
| Madden | Plaintiff | May 2 2017 | Create pretext for denial of Plaintiff's SERP benefits | 11, 103, 126 |
| McKinney | Plaintiff | May 2 2017 | Create pretext for denial of Plaintiff's SERP benefits | 11, 103, 126 |

APPENDIX B
Mail Fraud (18 U.S.C. § 1343) Predicate Acts
Cognizable as Racketeering Activity
under RICO (18 U.S.C. § 1961(1)(B)

| Representation By | To | Date | Purpose | Complaint ¶ |
|---|---|---|---|---|
| Green | FDIC/OTS/OCC | June 2010 to October 2013 | Mislead Bank Regulators as to GATEWAY's financial condition | 7.b., 7.c., 81- 83, 110.b. |
| Cheung | FDIC/OTS/OCC | June 2010 to 2016 | Mislead Bank Regulators as to GATEWAY's financial condition | 7.c., 91, 93, 110.d. |
| Keefe | FDIC/OTS/OCC | August 2014 to present | Mislead Bank Regulators as to GATEWAY's financial condition | 7.d., 92, 93, 96, 110.f., 126 |
| Wang | FDIC/OTS/OCC | March 2010 to 2016 | Mislead Bank Regulators as to GATEWAY's financial condition | 82, 110.c. |
| Fentriss | FDIC/OTS/OCC | June 2010 to 2012 | Mislead Bank Regulators as to GATEWAY's financial condition | 82, 110.e. |
| Lee | FDIC/OTS/OCC | March 2015 to March, 2017 | Mislead Bank Regulators as to GATEWAY's | 7.d., 92, 110.a., |

| | | | financial condition | |
|---|---|---|---|---|
| Keefe | Plaintiff | February 26, 2016 | Create pretext for denial of Plaintiff's SERP benefits | 100, 103 |
| Lee | Plaintiff | February 26, 2016 | Create pretext for denial of Plaintiff's SERP benefits and false basis for reporting of inflated GATEWAY assets to federal regulators | 100 |
| Thurkal | Plaintiff | May 2 2017 | Create pretext for denial of Plaintiff's SERP benefits and false basis for reporting of inflated GATEWAY assets to federal regulators | 11, 103, 126, 126 |
| Madden | Plaintiff | May 2 2017 | Create pretext for denial of Plaintiff's SERP benefits and false basis for reporting of inflated GATEWAY assets to federal regulators | 11, 103, 126 |
| McKinney | Plaintiff | May 2 2017 | Create pretext for denial of Plaintiff's SERP benefits and false basis for reporting of inflated GATEWAY assets to federal regulators | 11, 103, 126 |

APPENDIX C
Abstraction from Pension Fund (18 U.S.C. § 664) Predicate Acts
Cognizable as Racketeering Activity
under RICO (18 U.S.C. § 1961(1)(B)

| By | Act | Date | Purpose | Complaint ¶ |
|---|---|---|---|---|
| Green | Elimination of SERP Liability to Plaintiff | April 20, 2010 | Fraudulently increase GATEWAY capital to meet regulatory requirements | 78, 79, 110.b. |
| Wang | Elimination of SERP Liability to Plaintiff | April 20, 2010 | Fraudulently increase GATEWAY capital to meet regulatory requirements | 78, 110.c. |
| Fentriss | Elimination of SERP Liability to Plaintiff | April 20, 2010 | Fraudulently increase GATEWAY capital to meet regulatory requirements | 78, 110.e. |

§

APPENDIX D
Money Laundering (18 U.S.C. §§ 1956, 1957) Predicate Acts
Cognizable as Racketeering Activity
under RICO (18 U.S.C. § 1961(1)(B)

| By | Act | Date | Purpose | Complaint ¶ |
|---|---|---|---|---|
| Green | Maintaining funds belonging to third party in account for GATEWAY | November 4, 2010 | Fraudulently increase GATEWAY capital to meet regulatory requirements | 87, 110.b. |

APPENDIX E
Obstruction of Justice (18 U.S.C. § 1503) Predicate Acts
Cognizable as Racketeering Activity
under RICO (18 U.S.C. § 1961(1)(B)

| By | Act | Date | Purpose | Complaint ¶ |
|---|---|---|---|---|
| Green | False statement to FBI | June 15, 2011 | Create pretext that Plaintiff had | 10.a., 89, 110.b. |

| | | | defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of federal regulators | |
|---|---|---|---|---|
| Green | False statement to FBI | June 3, 2013 | Create pretext that Plaintiff had defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of federal regulators | 10.b., 94, 110.b. |
| Green | False Statement to FBI, AUSA | November 18, 2014 | Create pretext that Plaintiff had defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of federal regulators | 10.c., 95, 110.b. |
| Keefe | False affidavit filed in U.S. District Court, E.D.N.Y | November 23, 2015 | Create pretext that Plaintiff had defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of | 97, 110.f. |

| By | Act | Date | Purpose | Complaint ¶ |
|---|---|---|---|---|
| | | | federal regulators | |
| Keefe | False affidavit filed in U.S. District Court, E.D.N.Y | December 18, 2015 | Create pretext that Plaintiff had defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of federal regulators | 98, 110.f. |
| Fentriss | False statement to FBI and AUSA | November 12, 2014 | Create pretext that Plaintiff had defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of federal regulators | 99, 110.e. |

APPENDIX F
Obstruction of Justice (18 U.S.C. § 1512) Predicate Acts
Cognizable as Racketeering Activity
under RICO (18 U.S.C. § 1961(1)(B)

| By | Act | Date | Purpose | Complaint ¶ |
|---|---|---|---|---|
| Green | False statement to FBI, AUSA | November 18, 2014 | Create pretext that Plaintiff had defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of federal regulators | 10.c., 95, 110.b. |

| Keefe | False affidavit filed in U.S. District Court, E.D.N.Y | November 23, 2015 | Create pretext that Plaintiff had defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of federal regulators | 97, 110.f. |
|---|---|---|---|---|
| Keefe | False affidavit filed in U.S. District Court, E.D.N.Y | December 18, 2015 | Create pretext that Plaintiff had defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of federal regulators | 98, 110.f. |
| Fentriss | False statement to FBI, AUSA | November 12, 2014 | Create pretext that Plaintiff had defrauded bank and caused it damage to hide abstraction of SERP liability to Plaintiff on GATEWAY's books and deception of federal regulators | 99, 110.e. |