UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| POPPI METAXAS, | Case No. 19-cv-03819-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| KENNETH LEE, et al., | Docket No. 57 |
| Defendants. | |

## I.      INTRODUCTION

Plaintiff Poppi Metaxas brought this action under the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") against nine defendants ("Defendants"), all employees or former employees of the community bank she once ran as CEO.  Ms. Metaxas alleges that Defendants have "denied her claim for retirement benefits as part of a long-running criminal scheme to inflate the bank's assets with funds set aside for her retirement plan."  Docket No. 48 ("Order") at 1.  In June 2020, Ms. Metaxas filed a Corrected First Amended Complaint ("FAC") after this Court granted Defendants' motion to dismiss her original complaint for failing to state a claim for relief.  Defendants now move to dismiss the FAC on the same grounds.  For the following reasons, the Court **GRANTS** Defendants' motion and does so with prejudice.

## II.      BACKGROUND

A.      Factual Background

The facts of this case were originally stated in the Court's order of May 20, 2020, granting Defendants' motion to dismiss Ms. Metaxas's original complaint.  *See* Order at 2-4.  Gateway is a small, federally chartered bank based in northern California.  FAC ¶ 1.  Ms. Metaxas was

Gateway's CEO from 1995 until her resignation in May 2010. *Id.* ¶¶ 1, 66. In 2004, Gateway gave Ms. Metaxas a $290,000 raise but the money was not paid to her directly. *Id.* ¶ 2. Instead, Gateway used it to pay the premiums for a $5 million life insurance policy, which was to fund "a customized supplemental executive retirement plan" ("SERP") for Ms. Metaxas. *Id.* Under the SERP, Ms. Metaxas would become eligible for retirement benefits shortly after her retirement or her sixtieth birthday, whichever occurred later. *Id.* Exs. A & B. If Ms. Metaxas resigned voluntarily she would be entitled to all benefits that had already accrued, but if she was fired for cause she would not be entitled to any benefits. *Id.* Ex. A at 4–5.

Then came the financial crisis. By late 2008, a federal regulatory agency, the Office of Thrift Supervision ("OTS"), had instructed Gateway "to increase its capital position to provide coverage for potential losses from increasing levels of troubled assets." *Id.* ¶ 4. Gateway's Board was also directing the bank's executives to raise capital and sell troubled assets. *Id.*

It was at this point that trouble began for Ms. Metaxas and Gateway. Ms. Metaxas and Gateway's Vice President, Michael Kenny, orchestrated a transaction in which Gateway loaned its largest customer, Ideal Mortgage, $3.65 million. *Id.* ¶ 54; Defendant's RJN (Docket No. 57-2), Ex. B, Tr. of Pleading at 18–21. That money came straight back to Gateway, as the down payment on certain troubled assets that federal regulators wanted off the bank's books. *Id.* Although the transactions were intended to "make Gateway's books look more acceptable to regulators," Ms. Metaxas would later admit that, "[t]aken together, [they] did not actually improve the condition of the bank." *Id.* OTS was not fooled in any event, and the so-called Round-Trip Transaction led to greater regulatory scrutiny. FAC ¶ 6. In April 2009, OTS issued a cease-and-desist order, which among other things directed Gateway to "maintain certain minimum regulatory capital ratios." *Id.* ¶ 4.

According to the FAC, the cease-and-desist order was the catalyst for a plot to fraudulently deprive Ms. Metaxas of her SERP benefits. The scheme began on April 20, 2010, when defendants Tim Green, Lawrence Fentriss, and Lawrence Wang, along with James Baxter,[1]

---

[1] Baxter was a director of Gateway until his death in 2014. FAC ¶ 28. Green, Fentriss, and Wang are former officers and directors of the bank. *Id.* ¶¶ 19, 20, 27.

United States District Court
Northern District of California

1    illegally "eliminated GATEWAY's SERP PLAN liability" to Ms. Metaxas to meet the minimum

2    net capital requirements mandated by the cease-and-desist order. *Id.* ¶ 7(b), 78. (Defendants,

3    however, argue that this liability was never "eliminated" because it was always part of the bank's

4    general assets, and never specifically set aside for the SERP; *see infra* re: predicate act of

5    abstraction.) Appropriating the funds allowed Green, Fentriss, Wang and various other defendant

6    officers and directors of Gateway to fraudulently report to the FDIC and OTS (later the Office of

7    the Comptroller of the Currency ("OCC")) that Gateway had approximately $1.24 million more in

8    assets than it actually did. *Id.* ¶ 7(b), 78-80. That in turn helped Gateway meet the net capital

9    requirements imposed by OTS/OCC and avoid the regulatory consequences (*e.g.*, higher deposit

10   insurance premiums) that would otherwise have followed. *Id.* Gateway's false reporting to the

11   regulatory agencies allegedly continues to the present day. *See, e.g.*, *id.* ¶ 7(b)-(c).

12            The next step in the scheme was to deny Ms. Metaxas her SERP benefits. Ms. Metaxas

13   had begun receiving cancer treatments in 2008, went on sick leave in March 2010, and submitted

14   her resignation to the Board of Directors on May 26, 2010. *Id.* ¶ 3. The Board accepted Ms.

15   Metaxas's resignation the next day. *Id.* ¶ 66. On March 25, 2013, a few weeks before her sixtieth

16   birthday, Ms. Metaxas submitted her claim for SERP benefits. *Id.* ¶¶ 69–70. Her claim was

17   denied on February 25, 2016 by a SERP Administrative Committee composed of Defendants

18   Kenneth Lee and James Joseph Keefe, and Oakland Branch Manager Frances Baker. *Id.* ¶ 99.

19   Ms. Metaxas alleges that the basis for the denial was fraudulent because, *e.g.*, the committee stated

20   that she was not disabled when she ended her employment with Gateway, was not owed the

21   benefits that had accrued as of her resignation, and had not performed at a level meriting SERP

22   benefits. *Id.* Ms. Metaxas appealed the denial of her claim. *Id.* ¶ 100. An appeals committee

23   composed of defendants Dale McKinney, Colin Madden, and Vinod Thukral then denied her

24   appeal, again based on allegedly false statements. *Id.* In denying Ms. Metaxas's request for

25   benefits, the committee explained that "[Metaxas] did not qualify for SERP benefits because

26   'ample evidence shows Ms. Metaxas's willful and intentional violation of banking laws, most

27   notably her own guilty plea,' warranted termination for cause such that [Metaxas] was not entitled

28   to benefits pursuant to Section 3.4 of the SERP." Docket No. 57 ("Mot.") at 5; *see also id.* at 2-3

United States District Court
Northern District of California

1   (describing SERP provisions that allowed the bank to discontinue participation in the plan).

2   The final step in the scheme was lying to law enforcement to hide the wrongful elimination

3   of Gateway's liability to Ms. Metaxas and the ensuing false statements to federal regulators.  By

4   June 2011, law enforcement was investigating the Round-Trip Transaction.  FAC ¶ 89.  Ms.

5   Metaxas alleges that various defendants made false statements in interviews with the FBI and the

6   U.S. Attorney's Office and in affidavits filed with a United States district court.  *Id.* ¶ 10.  These

7   false statements fell into two categories: exaggerations of the damages Gateway suffered because

8   of Ms. Metaxas's conduct, and false claims that Ms. Metaxas was fired (or knew she was going to

9   be fired).  *See, e.g.*, *id.* ¶¶ 10, 73.

10   Ms. Metaxas eventually pled guilty to one count of conspiracy to commit bank fraud in the

11   Eastern District of New York in April 2015.  *Id.* ¶ 73.  At her plea hearing, Ms. Metaxas admitted

12   that she helped arrange the Round-Trip Transaction and that she "did not provide the complete

13   information about th[is] transaction[ ] to Gateway's board."  Docket No. 57-2 ("Defendants'

14   RJN"), Ex. B, Tr. of Pleading at 18–19.  Ms. Metaxas further acknowledged that she "knew it was

15   against the law to commit a fraudulent scheme like this."  *Id.* at 22.  Ms. Metaxas later filed a

16   petition "to overturn her guilty plea and conviction . . . on grounds of ineffective assistance of

17   counsel"; the petition was denied earlier this year and is currently on appeal.  FAC ¶ 104.

18   In July 2015, Gateway sued Ms. Metaxas in the Superior Court of San Mateo County,

19   California, "seeking damages it allegedly suffered as a result of the Round-Trip Transaction."  *Id.*

20   ¶ 74.  After an eight-day bench trial, the court ruled for Gateway.  Mot. at 1.  It emphasized that

21   Ms. Metaxas admitted, when pleading guilty, that she had been an integral part of the criminal

22   scheme.  Mot. at 6 (quoting Defendants' RJN, Ex. A, State Court Decision at 11-17); *see also*

23   Defendants' RJN, Ex. A, State Court Decision at 12 (finding that Metaxas understood the

24   fraudulent nature of the Round-Trip Transaction when she presented it to the Gateway board and

25   intentionally misled the board into believing the Transaction was legitimate).  Ms. Metaxas has

26   since moved to vacate the judgment.  Mot. at 1 n.4.

27   B.    Procedural Background

28   The pending motion follows Defendants' successful motion to dismiss Ms. Metaxas's

original complaint.  There, Defendants argued that Ms. Metaxas's claims were (1) barred by the doctrine of collateral estoppel, (2) untimely, and (3) inadequately pled.  *See* Order at 5.  The Court rejected the first and second of these contentions but agreed with the third, concluding, *inter alia*, that Ms. Metaxas failed to allege a "pattern of racketeering activity" within the meaning of RICO. *Id.* at 17-20.

### 1.   Collateral Estoppel

Defendants first argued that because Ms. Metaxas previously "pled guilty to conspiring against Gateway and deceiving its Board" she could not later allege "that Defendants committed predicate RICO acts by creating a false pretext for denying her SERP benefits." *Id.* at 7 (internal quotations omitted).  But the Court held that her guilty plea did not preclude Ms. Metaxas from alleging, *e.g.*, "that denial of her SERP benefits was premised on fraudulent misrepresentations," as this contention is "unrelated to her criminal conviction." *Id.* at 7-8.  Ms. Metaxas's guilty plea therefore did not bar her RICO claims. *Id.* at 8.

### 2.   Statute of Limitations

The Court also disagreed that Ms. Metaxas's claims were barred by RICO's four-year statute of limitations.  Defendants argued that Ms. Metaxas became aware of her underlying injury (*i.e.*, the denial of SERP benefits) more than four years before she filed her complaint in July 2019 because she was entitled to begin receiving benefits shortly after her sixtieth birthday in May 2013. *Id.* at 8-9.  Ms. Metaxas countered that the limitations period had been "contractually or equitably tolled by a series of tolling agreements between her and Gateway." *Id.* at 9; *see also* FAC Exs. C-G.  The Court concluded that these agreements governed only claims that might be brought between Ms. Metaxas and Gateway, not those between her and the bank's officers and directors. *Id.* at 9-10 (citing *Resolution Trust Corp. v. Bonner*, 848 F. Supp. 96, 98-99 (S.D. Tex. 1994)).  Nevertheless, the Court accepted Ms. Metaxas's alternative argument that her complaint was timely "because she did not know (and had no reason to know) of her injury until the SERP Administrative Committee denied her claims in February 2016." *Id.* at 10.  And as the "tolling agreements applied to Ms. Metaxas's claim for SERP benefits," Ms. Metaxas "could not have known that her SERP benefits had been denied until, at the earliest, the tolling agreements

United States District Court
Northern District of California

1    expired." *Id.*  Since the last of these agreements did not terminate until July 2015, Ms. Metaxas's

2    filing of this action in July 2019 was timely on this basis, as well.  *Id.*

3           3.    <u>Adequacy of Pleading a RICO Claim</u>

4           In response to Defendants' argument that Ms. Metaxas failed to adequately plead her

5    RICO claims, the Court considered Ms. Metaxas's allegations of Defendants' (1) predicate acts,

6    (2) pattern of racketeering activity, and (3) causation—all required elements of a RICO claim

7    under 18 U.S.C. § 1962(c).  *See id.* at 11.

8           Ms. Metaxas's original complaint alleged several categories of predicate acts, including

9    false statements to federal regulators, money-laundering violations, and illegal abstraction of

10   "Gateway's liability for her SERP benefits."  *See id.*

11          As to the first category, Ms. Metaxas argued that Defendants' false statements to regulators

12   at the FDIC and OTS/OCC constituted mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

13   *Id.* at 12.  Defendants responded "that these allegations fail[ed] to satisfy Rule 9(b)'s heightened

14   pleading standard for fraud."  *Id.*  The Court disagreed, pointing to extensive factual details in

15   what are now ¶¶ 83 ff. of the FAC.[2]  *Id.* at 12-13.  Ms. Metaxas therefore "sufficiently allege[d]

16   the who, when, where, and why required by Rule 9(b)."  *Id.* at 13.  But the Court also held that the

17   complaint did not adequately allege that Defendants' misleading statements "somehow 'deprive[d]

18   [the regulatory agencies] of money or property,'" as required by the mail and wire fraud statutes.

19   *Id.* at 13 (quoting *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020)).  The mail and

20   wire fraud accusations thus failed to constitute predicate acts under RICO.

21          Regarding the last two categories, Defendants did not contest the adequacy of Ms.

22   Metaxas's allegations that they had illegally abstracted her pension funds in violation of 18 U.S.C.

23   § 664, and the Court held that this predicate was sufficiently pled.  *Id.* at 16.  "In contrast, the

24   money laundering allegations [were] not well-pled" because Ms. Metaxas failed to explain how

25   certain Gateway financial reports relating to the Round-Trip Transaction "involved proceeds from

26   an unlawful transaction," as required by 18 U.S.C. §§ 1956 and 1957.  *Id.* at 17.  The Court thus

27

28   _____
     [2] These were ¶¶ 81-83 of the original complaint; *see* Docket No. 1.

concluded that "only the final category of predicate acts, illegal abstraction from a pension plan," qualified as an underlying offense for RICO purposes. *Id.* at 11.

The dispositive portion of the Court's opinion concerned Ms. Metaxas's failure to allege a "pattern of racketeering activity" because of two shortcomings in the original complaint. First, such a pattern "'requires at least two' predicate acts committed 'within ten years,'" and Ms. Metaxas "alleged only one predicate act, abstraction from a pension fund." *Id.* at 17 (quoting 18 U.S.C. § 1961(5)). Second, even if her mail and wire fraud allegations had been adequately pled, Ms. Metaxas failed to satisfy the "continuity" requirement of RICO, as she alleged only "a single scheme (to unlawfully deny her retirement benefits) with a single victim (herself)." *Id.* at 18. Specifically, "her allegations of false reports to regulatory agencies and law enforcement" failed to establish open-ended continuity since these "were the inevitable consequence, or at most cover-up, of the completed criminal scheme," *id.*, and "efforts to conceal a completed criminal scheme do not establish a threat of additional criminal activity in the future," *id.* at 19. And "despite the fact several years passed between the alleged abstraction of Ms. Metaxas's SERP benefits and the formal denial of her SERP claim," "additional factors, such as the number of predicate acts, victims, and injuries" all argued against a finding of closed-ended continuity. *Id.* at 20. Because Ms. Metaxas failed to plead either sufficient predicate acts or continuity of wrongdoing, as required by RICO's "pattern" element, her claim as a whole failed.

The Court concluded its analysis by ruling that Ms. Metaxas "adequately alleged both but-for and proximate causation" in linking Defendants' predicate acts to her injury. *Id.* at 20. But her additional claim that Defendants violated RICO's conspiracy provision, 18 U.S.C. § 1962(d), was rejected, as she did not sufficiently plead a substantive violation of the Act under § 1962(c). *Id.* at 21-22.

The Court therefore dismissed Ms. Metaxas's original complaint, characterizing her claims as presenting "a single garden-variety fraud," *id.* at 1, rather than "a continuing criminal conspiracy," *id.* at 22. Ms. Metaxas was, however, given leave to amend. *Id.* She filed the FAC

United States District Court
Northern District of California

1  in late June 2020 and Defendants moved to dismiss at the end of July.  *See* FAC, Mot.[3]

2  ### III.      LEGAL STANDARD

3        Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

4  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

5  complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R.

6  Civ. P. 12(b)(6).

7        To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in

8  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007),

9  a plaintiff's "factual allegations [in the complaint] must . . . suggest that the claim has at least a

10  plausible chance of success."  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (internal

11  quotation omitted).  The court "accept[s] factual allegations in the complaint as true and

12  construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*

13  *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

14  complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

15  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

16  effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

17  2011)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

18  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

19  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it

20  asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting

21  *Twombly*, 550 U.S. at 556).

22        Claims for fraud must meet the heightened pleading standard of Federal Rule of Civil

23  Procedure 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the

24  circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b) "requires . . . an

25  _____

26  [3] In February 2020, Ms. Metaxas filed another action against Gateway and the SERP Plan in this
District, "challenging the same denial of benefits under the Plan that is the grounds for her RICO
27  claims" here.  Docket No. 49 at 2; *see* Case No. 20-cv-01184-JD.  In the newer case, Ms. Metaxas
asserted two causes of action against Defendants and the Plan under ERISA, 29 U.S.C. § 1132(a).
28  *Id.*  On June 23, the Court granted Defendants' motion to relate the ERISA action to the instant
case.  Docket No. 52.

account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).

## IV.    <u>DISCUSSION</u>

In response to the original complaint's shortcomings, Ms. Metaxas strenuously attempts to characterize Defendants' denial of Ms. Metaxas's SERP benefits as but one aspect of an elaborate scheme to defraud federal banking regulators. Ms. Metaxas once again claims violations of RICO under 18 U.S.C. ¶¶ 1962(c) and (d); the FAC alleges new predicate acts of mail and wire fraud (18 U.S.C. §§ 1341 and 1343), bank fraud (18 U.S.C. § 1344), and money laundering (18 U.S.C. §§ 1956 and 1957). *See* FAC ¶ 122. Ms. Metaxas also continues to allege abstraction from a pension or employee benefit fund (18 U.S.C. § 664), which the Court found adequately pled in her original complaint. *See id.*

Defendants offer four arguments for why the FAC should be dismissed. First (and despite the Court's earlier ruling), Ms. Metaxas's claims are time-barred by the statute of limitations. Mot. at 2. Second, Ms. Metaxas's "allegations of the two predicate acts of money laundering and mail and wire fraud are not adequately pled with any specificity" and so fail to satisfy Rule 9(b). *Id.* Third, the FAC fails to "allege the requisite intent to conceal or disguise the nature, source, [or] ownership of SERP funds" in accusing Defendants of money laundering. *Id.* And fourth, Ms. Metaxas again "cannot plead 'continuity' of the alleged criminal activity given that the alleged act (the denial of her SERP benefits) is over." *Id.*

A.    <u>Request for Judicial Notice</u>

Both parties request that the Court take notice of numerous documents. Courts may take judicial notice of facts that are "not subject to reasonable dispute" because they (1) are "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Matters of public record may be judicially noticed, but disputed facts contained in those records may not. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

Defendants request that the Court take notice of nine documents. *See* Docket No. 57-1

9

1     ("Defendants' RJN") at 1-2.  Eight of them relate to the earlier judicial proceedings involving Ms.

2     Metaxas and Gateway.  *Id.* at 2-3.  Because these documents are public court records, they are

3     properly subject to judicial notice.  *See Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir.

4     2002).  The Court, however, does not take notice of the truth of the statements contained therein.

5     The ninth document is a redacted copy of the SERP appeals committee's decision denying Ms.

6     Metaxas's benefits.  Defendants' RJN at 3, Ex. F.  As the FAC necessarily relies on this document

7     and Ms. Metaxas does not contest its authenticity, judicial notice is appropriate for the appeals

8     committee decision as well, although again not necessarily for the truth of any matters asserted

9     therein.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

10         Ms. Metaxas requests that the Court take notice of the 2000 Statement of the Financial

11     Accounting Standards Board ("FASB"), which is referenced in her opposition brief.  *See* Docket

12     No. 60 ("Plaintiff's RJN") at 1; Docket No. 59 ("Opp'n") at 8-9.  Defendants contest the request

13     because, they argue, Ms. Metaxas is asking the Court "to take judicial notice of documents for the

14     truth of their contents and to accept conclusions that Plaintiff seeks to draw from them," namely

15     that "the FASB sets forth the standard applicable to Defendants and the alleged failure to abide by

16     those standards satisf[ies] the RICO pleading requirements."  Docket No. 62 at 1-2.  As with the

17     parties' other requests, the Court takes notice of the FASB standards, without reaching any

18     conclusion as to the truth or accuracy of the statements therein or their applicability to Defendants.

19     B.     Statute of Limitations

20         Defendants argue, as they did in their earlier motion to dismiss, that because "RICO claims

21     are subject to a four-year statute of limitations," Ms. Metaxas's claims are time-barred.  Mot. at

22     11.  They contend that she was (or should have been) aware of her injury when she was denied

23     SERP benefits in 2013, or at least when she filed a counter-complaint seeking payment of those

24     benefits in the Superior Court action in late 2015.  *Id.* at 12; *see also* Docket No. 61 ("Reply") at

25     2-5.  Defendants specifically point to language in Ms. Metaxas's original complaint suggesting

26     that she "'had enough information to warrant an investigation which, if reasonably diligent, would

27     have led to discovery of the [alleged] fraud' in May of 2013."  Reply at 3.

28         But the Court expressly held in its earlier order that the statute of limitations on Ms.

United States District Court
Northern District of California

1   Metaxas's RICO claims did not begin running "until the SERP Administrative Committee denied

2   her claim [for benefits] in February 2016."  Order at 10.  As Ms. Metaxas points out, "Defendants

3   made the exact same arguments on their Rule 12(b)(6) motion attacking the original complaint,"

4   including by pointing to Ms. Metaxas's cross-complaint in the state court action.  Opp'n at 4;

5   Docket No. 22 at 13.  In reaching its earlier decision, the Court also had the benefit of

6   supplemental briefing on the effect of the tolling agreements vis-à-vis the statute of limitations.

7   *See* Opp'n at 4; Order at 4, 9-10.  In sum, the motion "cites to no new authority and presents no

8   new facts" to support Defendants' argument.  Opp'n at 4.  That argument is therefore again

9   rejected.

10   C.   Adequacy of Pleading a RICO Claim

11        Ms. Metaxas alleges that Defendants have committed RICO violations under 18 U.S.C.

12   § 1962(c)-(d).  Section 1962(c) provides:

13        It shall be unlawful for any person employed by or associated with
        any enterprise engaged in, or the activities of which affect, interstate
14        or foreign commerce, to conduct or participate, directly or
        indirectly, in the conduct of such enterprise's affairs through a
15        pattern of racketeering activity or collection of unlawful debt.

16   Section 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the

17   provisions of subsection (a), (b), or (c) of this section."

18        To successfully plead a civil RICO claim under § 1962(c), plaintiffs must plausibly allege

19   that Defendants engaged in "(1) conduct (2) of an enterprise, (3) through a pattern (4) of

20   racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  Plaintiffs must

21   also satisfy RICO's statutory standing provisions, which require them to plausibly allege an injury

22   to "business or property" that is proximately caused "by reason of a violation of section 1962."  18

23   U.S.C. § 1964(c); *see also Diaz v. Gates*, 420 F.3d 897, 900-901 (9th Cir. 2005) (en banc)

24   (discussing the "business or property" and causation requirements of § 1964(c)).  Ms. Metaxas and

25   Defendants principally dispute whether she has satisfied the "racketeering activity" (or predicate

26   act) and "pattern" elements of § 1962(c).

27        1.   Predicate Acts

28        "'[R]acketeering activity' is any act indictable under several provisions of Title 18 of the

United States District Court
Northern District of California

United States Code," namely those enumerated at 18 U.S.C. § 1961(1).  *Turner v. Cook*, 362 F.3d

1219, 1229 (9th Cir. 2004).  The FAC's allegations of racketeering activity fall into four

categories: (1) "alleged false statements to the regulators regarding Gateway's financial

condition," *i.e.*, mail and wire fraud; (2) "alleged false statements to the Board of Directors . . .

regarding Plaintiff's entitlements to SERP benefits," *i.e.*, bank fraud; (3) "alleged money

laundering by transferring SERP funds into a regular compensation account and paying general

compensation expenses with SERP funds; and (4) "illegal abstraction from a pension plan."  Mot.

at 13-14.  Each of these crimes qualify as valid predicate acts under RICO.  *See* 18 U.S.C.

§ 1961(1).

                    a.    Mail and Wire Fraud

        As in her original complaint, Ms. Metaxas alleges that on numerous occasions several

defendants "authorized and approved the submission of financial information and statements,

including Call Reports, to the FDIC and OTS/OCC falsely omitting GATEWAY's liability to

PLAINTIFF's SERP PLAN," and thus committed mail and wire fraud in violation of 18 U.S.C. §§

1341 and 1343. *See, e.g.*, FAC ¶ 90; *see also id.* Apps. A & B.  Sections 1341 and 1343 each

prohibit "any scheme or artifice to defraud, or for obtaining money or property by means of false

or fraudulent pretenses, representations, or promises."  "The mail and wire fraud statutes are

identical except for the particular method used to disseminate the fraud, and contain three

elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in

furtherance of that scheme, and (C) the specific intent to defraud."  *Eclectic Props. E., LLC v.

Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).  Additionally, as Supreme Court has

recently emphasized, property fraud statutes (including the mail and wire fraud statutes) are

"limited in scope to the protection of property rights" and so "prohibit[] only deceptive 'schemes

to deprive [the victim of] money or property.'"  *Kelly v. United States*, 140 S. Ct. 1565, 1571

(2020) (quoting *McNally v. United States*, 483 U.S. 350, 360, 356 (1987)).

        Defendants' only objection to the mail and wire fraud allegations is that they fail to satisfy

Rule 9(b)'s heightened pleading standard for fraud.  *See* Motion at 14.  This contention is again

identical to that of Defendants' earlier motion to dismiss, which the Court expressly rejected.

United States District Court
Northern District of California

1    Opp'n at 6; Order at 12.  The Court found that Ms. Metaxas alleged with particularity the "specific

2    defendants [who] signed off on false reports," "the exact months those false reports were

3    submitted," the locations from which the reports were sent, and the reasons "why the statements

4    were misleading."  *Id.* at 12-13.  As Defendants simply "rehash arguments the court had

5    previously rejected," *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 996 n.3 (N.D. Cal.

6    2014), it follows that "Ms. Metaxas sufficiently alleges the who, when, where, and why required

7    by Rule 9(b)," Order at 13.[4]

8            In its earlier ruling, the Court also found that Ms. Metaxas failed to satisfy the mail/wire

9    fraud requirement that "a defendant must act with the intent . . . to deprive a victim of money or

10   property by means of [his] deceptions."  Order at 13 (quoting *Miller*, 953 F.3d at 1101).  The

11   original complaint alleged that Defendants "misled federal regulators as to Gateway's financial

12   condition" but not that "these false statements somehow 'deprive[d] [them] of money or

13   property.'"  *Id.* (quoting *Miller*, 953 F.3d at 1101).  In the FAC, Ms. Metaxas seeks to cure this

14   defect by arguing at length that Defendants' false statements were made "with the intent to obtain

15   lower FDIC premium charges for GATEWAY than would have been charged by the FDIC had

16   they accurately reported GATEWAY'S core capital by truthfully reflecting the bank's SERP

17   liability to Plaintiff."[5]  FAC ¶ 96.  Ms. Metaxas alleges that from 2012 to 2018, Defendants'

18   misstatements to the FDIC saved Gateway "over $2.5 Million dollars in premiums," *id.* ¶ 96

19   (though she does not explain how she arrived at this figure).

20           Defendants do not appear to dispute that these allegations satisfy the money-or-property

21   requirement of §§ 1341 and 1343.  And the FAC offers a wealth of detail describing how, *e.g.*, the

22   _____

23   [4] Defendants contend that Gateway's statements to federal regulators "were not false as Gateway
     had no existing liability to Plaintiff's SERP Plan."  Mot. at 14.  They therefore seem to be arguing
24   that there was no "scheme to defraud" or "specific intent to defraud" under §§ 1341 and 1343
     because Defendants' actions were perfectly lawful, a claim that they develop more fully elsewhere
25   in their briefs.  *See infra*.  But Ms. Metaxas's allegations that Defendants "falsely report[ed]
     Gateway's inflated assets" to regulators "in order to obtain lower premiums and fee charges"
26   sufficiently plead the intent elements of mail and wire fraud, particularly since on a motion to
     dismiss a plaintiff's factual allegations are assumed to be true.  *See* Opp'n at 7.

27   [5] Ms. Metaxas makes a similar claim with respect to the "regulated bank fees" charged by
     OTS/OCC, which are "based on the regulatory risk that the institution poses," *e.g.*, "the
28   relationship between the institution's core capital and its total assets."  *Id.* ¶ 97.

                                                    13

1    FDIC calculates the insurance premiums it charges banks on a quarterly basis.  *See* FAC ¶ 95.

2    Assuming the truth of Ms. Metaxas's assertions, it seems plausible that Gateway's claims to have

3    some $1.24 million in extra capital would reduce the bank's obligations to the FDIC and

4    OTS/OCC and thus deprived them of money to which they were entitled.  Since Defendants fail to

5    contest the sufficiency of Ms. Metaxas's allegations on this issue, the Court concludes that she has

6    adequately pled the predicate acts of mail and wire fraud.

7                      b.    Bank Fraud

8          The parties devote a good deal of space to Ms. Metaxas's allegation that Defendants

9    committed bank fraud in violation of 18 U.S.C. § 1344.  Section 1344 makes it a crime knowingly

10   "(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets,

11   securities, or other property owned by, or under the custody or control of, a financial institution,

12   by means of false or fraudulent pretenses, representations, or promises."  Ms. Metaxas argues that

13   Defendants violated § 1344—without specifying which subsection—"[b]y misrepresenting to the

14   [Gateway] Board and SERP Administrative Committee the true known facts concerning Plaintiff's

15   disability and its materiality to her right to accrued SERP benefits."  Opp'n at 12 (citing FAC ¶¶

16   98-99); FAC ¶ 123.  Defendants thereby "deceived the Bank, putting it at risk of litigation by

17   Plaintiff over her SERP benefit, which risk has now come to pass"; put differently, they "deprived

18   the Bank of an informed decision by its Board and/or SERP Administrative Committee as to the

19   risks involved in denying Plaintiff her right to benefits."  *Id.*

20         Defendants respond by arguing, *inter alia*, that Ms. Metaxas's allegations "are contradicted

21   by [her] guilty plea and therefore barred by the doctrine of collateral estoppel," Mot. at 15, and

22   that "only a financial institution [has] standing" to "allege bank fraud as a predicate act for RICO

23   purposes," *id.* at 16.[6]

24         These issues are largely beside the point, however, as Ms. Metaxas has failed to show how

25   Defendants' purported scheme to commit bank fraud deprived Gateway of any property interest.

26   As described above, she alleges that Defendants "deceived the Bank" by lying about Ms.

27   _____

28   [6] On Defendants' arguments about Ms. Metaxas's lack of statutory standing to allege certain
     predicate acts, see *infra*.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Metaxas's disability (and therefore her eligibility for SERP benefits).  But she claims only that this

2    deception put Gateway at a heightened risk of eventual litigation with Ms. Metaxas or,

3    alternatively, that it "deprived the Bank of an informed decision" as to this litigation risk.  As

4    Defendants point out, "such an informed decision . . . is obviously not property under custody or

5    control of" Gateway.  Reply at 6-7.  Ms. Metaxas's allegations therefore fail to satisfy the plain

6    terms of § 1344(2).  And it likewise fails to satisfy § 1344(1), as that provision also requires a

7    scheme "to obtain property belonging to [a] bank."  *See Shaw v. United States*, 137 S. Ct. 462, 469

8    (2016); *see also Kelly*, 140 S. Ct. at 1571 (reiterating that property fraud statutes apply only to

9    "schemes to deprive [the victim of] money or property").  Ms. Metaxas does not allege as much in

10   the FAC, nor does she cite any authority for the principle that undermining a bank's ability to

11   make an "informed decision" creates liability under § 1344.  And "because the abstracted funds

12   were allegedly used by Gateway itself" as part of Defendants' broader scheme, Reply at 8, it is

13   particularly unclear how the bank was deprived of money or property.

14          Ms. Metaxas's bank fraud claim therefore cannot serve as a predicate act under RICO.

15                  c.      Money Laundering

16          The parties also dispute whether Ms. Metaxas has adequately alleged money laundering

17   offenses under 18 U.S.C. §§ 1956 and 1957.  The gravamen of Ms. Metaxas's claim is that

18   "Defendants knew that the [SERP] funds were proceeds of an unlawful abstraction yet used the

19   abstracted funds to pay regular compensation expenses to disguise the nature or source of those

20   funds."  Opp'n at 17 (citing FAC ¶¶ 122-23).

21          To plead a violation of § 1956, a plaintiff must allege that the defendant "(1) engaged in a

22   financial transaction which involved proceeds from specified illegal activity, (2) knew the

23   proceeds were from illegal activity, and (3) intended the transaction either to promote the illegal

24   activity or to conceal the nature, source, or ownership of the illegal proceeds."  *United States v.*

25   *Marbella*, 73 F.3d 1508, 1514 (9th Cir. 1996).  Section 1957, in contrast, requires a plaintiff to

26   show that "(1) the defendant knowingly engaged in a monetary transaction; (2) he knew the

27   transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the

28   property was derived from a specified unlawful activity."  *United States v. Rogers*, 321 F.3d 1226,

1  1229 (9th Cir. 2003).

2        Beyond paraphrasing the language of §§ 1956 and 1957, the only factual allegation of

3  money laundering that Ms. Metaxas adduces comes from ¶ 123(b)(2) of her complaint: "Sometime

4  in March or April of 2010, Defendant Green transferred funds held in GATEWAY'S SERP

5  account representing reserves for pension fund liabilities on Plaintiff's SERP PLAN to

6  GATEWAY's Compensation account, and thereafter used the proceeds from the abstraction of the

7  SERP funds to pay regular compensation expenses of GATEWAY . . . ." *See* Opp'n at 16-17.

8        Defendants focus, *inter alia*, on the heightened pleading requirements for money-

9  laundering claims under Rule 9(b), Mot. at 17, and Ms. Metaxas questions the applicability of

10  Rule 9(b) to such claims, Opp'n at 15-16.  Defendants' essential point, though, is that the FAC has

11  not adequately alleged "that Defendants knew the proceeds/transactions involved illegal

12  activities."  Reply at 10.  Regarding § 1956, they argue that Ms. Metaxas fails to explain "how the

13  transfer or use of the SERP funds was intended . . . [to] disguise the nature of the proceeds of the

14  abstraction."  Mot. at 17-18.  They further argue that while § 1957 lacks the intent-to-conceal

15  requirement of § 1956, Ms. Metaxas's mere allegation "that Defendants made a transfer to

16  Gateway's compensation account from which Gateway's employees were paid" does not indicate

17  any knowledge of the transfer's illegality.  Reply at 10-11; Opp'n at 18 (citing FAC ¶ 80).

18        Assuming that the FAC "sufficiently alleges the who, when, where, and why required by

19  Rule 9(b)," Order at 13, Ms. Metaxas nevertheless fails to allege facts showing *how* Defendants

20  used "the abstracted funds to pay regular compensation expenses" in such a way that they

21  "disguise[d] the nature or source of those funds."  *See* Opp'n at 17.  Defendants contend that there

22  was no segregated account for the SERP benefits, as they would have been paid out of the bank's

23  general funds.  *See infra*; *see also* Mot. at 18-19 (arguing that Metaxas "alleges nothing more than

24  that the general asset funds that could have been used to pay her SERP benefits were instead used

25  for payroll," and that this lawful activity cannot form the basis of money laundering allegations).

26  "[W]here a defendant takes no steps to disguise or conceal the source or destination of [allegedly

27  laundered] funds, leaving an easy-to-follow trail in moving money around," the "transactions

28  conspicuously lack the convoluted character associated with money laundering."  *United States v.*

United States District Court
Northern District of California

16

*Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (internal quotations omitted); *see also United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) ("The money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds.");  *Mocha Mill, Inc. v. Port of Mokha, Inc.*, No. 18-cv-02539-HSG, 2019 WL 1048252, at *10 (N.D. Cal. Mar. 5, 2019) (rejecting theory "that by committing fraud in the past, Defendants acquired criminal proceeds" and "because every transaction [of Defendants' company] is infected by the past fraud, each such transaction constitutes money laundering.").

Ms. Metaxas thus fails to show that Defendants engaged in the predicate act of money laundering under § 1956.  Her related claim under § 1957 presents a closer question.  The conclusory nature of her allegations (*i.e.*, that "Defendants knew that the [SERP] funds were proceeds of an unlawful abstraction," Opp'n at 17) and the fact that the allegations are dependent on her questionable abstraction claim, *see infra*, raise serious doubts over whether the § 1957 claim is adequately pled.  As the Court ultimately resolves this motion on other grounds, however, it assumes, *arguendo*, that Ms. Metaxas has sufficiently alleged a violation of § 1957 as a RICO predicate act.

d.   Abstraction

As in her original complaint, Ms. Metaxas argues that Defendants Green, Fentriss, and Wang "intentionally interfered with [her] right to receive benefits under the SERP and falsely eliminated GATEWAY's SERP PLAN liability of $1,236,448.04 as of March 31, 2010, thereby committing a violation of 18 U.S.C. § 664."  FAC ¶ 78.  Under § 664, "[a]ny person who . . . willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any . . . employee pension benefit plan" is liable for abstraction.

In its earlier order, the Court found that Ms. Metaxas had adequately alleged a violation of § 664, Order at 16, and the FAC appears to include additional details supporting her claim.  Ms. Metaxas also points out that "the Court had the SERP Plan before it as an exhibit to the original complaint," and that Defendants cited to their primary authority on this issue, *Hill v. Opus Corp.*,

841 F. Supp. 2d 1070 (C.D. Cal. 2011), in their earlier motion to dismiss (though for different purposes). Opp'n at 18; Docket 22 at 25. Ms. Metaxas's argument that Defendants' challenge to the adequacy of her abstraction allegations "is yet another attempt to seek reconsideration of the Court's prior rulings" therefore carries some weight. *Id.*

At the same time, the earlier order noted that Defendants did not challenge the adequacy of the abstraction allegations in their first motion to dismiss. Order at 16. Here, they do. Citing specific language in Ms. Metaxas's SERP agreement with Gateway, FAC Ex. A § 10.1, Defendants argue that the SERP "is an ***unfunded*** top hat plan." Mot. at 19 (emphasis in original). Payment under such a plan comes "only from the company's general assets," and plan participants "have no secured interest in any of the monies in the plan" and no "cognizable property interest" in those monies. *Id.* (quoting *Hill*, 841 F. Supp. 2d at 1090-91, 1093); *see also id.* (quoting additional SERP language stating that "all of [Gateway's] assets and policies shall be, and remain, the general, unpledged, unrestricted assets of [Gateway]"). Ms. Metaxas thus fails to plead abstraction, Defendants argue, because "she alleges nothing more than that the general asset funds that could have been used to pay her SERP benefits were instead used for" other legitimate purposes. *Id.*

Ms. Metaxas counters that the allegedly abstracted SERP funds were not part of the bank's general assets but were "segregated" in a separate account before "Defendants . . . transferred [them] to the compensation [expense] account." Opp'n at 20 (citing FAC ¶ 80). Additionally, Ms. Metaxas argues that the SERP differs from the top hat plan in *Hill* in important ways. For example, whereas "the contributions to the [*Hill*] plan were to come from the employer," here "the SERP was funded from [Metaxas's] compensation" and a life insurance policy purchased specifically for that purpose. *Id.* at 19 (citing FAC ¶¶ 45-46). Ms. Metaxas also cites to *United States v. Grizzle*, 933 F.2d 943 (11th Cir. 1991), which held that contributions "directly taken from the property of . . . individual employees," *i.e.*, from wages to which they were entitled, "could serve as the basis of an embezzlement conviction under 18 U.S.C. § 664." Opp'n at 19-20; *see also Hill*, 841 F. Supp. 2d at 1094 (distinguishing *Grizzle*, 933 F.2d at 946). Lastly, Ms. Metaxas argues that even if she lacked a cognizable property interest in the retirement funds themselves,

United States District Court
Northern District of California

1    the SERP still "constituted a contract between [her] and Gateway" such that Defendants'

2    abstraction "interfered with her contract for SERP benefits."  Opp'n at 20.  And because the

3    "Ninth Circuit recognizes interference with contract as . . . an injury to a 'property' interest under

4    RICO," the FAC "properly alleges abstraction of the SERP liability as a predicate act."  *Id.* at 21

5    (citing *Diaz*, 420 F.3d at 902).

6        While the issue is a close one, the Court again assumes, *arguendo*, that Ms. Metaxas has

7    made out a plausible claim at the pleading stage.  To be sure, Defendants quote language in the

8    SERP suggesting that it is indeed a top hat plan: it was "intended to be an unfunded plan" whose

9    beneficiaries would have "no legal or equitable rights, claims or interests" in Gateway's general

10   assets.  Mot. at 19 (quoting FAC Ex. A §§ 10.1-10.2).  Defendants also point to *Hill's* holding that

11   participants in such a plan have no cognizable property interest that would allow them to state a

12   claim under RICO.  *See* 841 F. Supp. 2d at 1089-95.  And they note that courts "are not required

13   to accept as true conclusory allegations which are contradicted by documents referred to in the

14   complaint."  *See* Reply at 12; *see also*, *e.g.*, *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090,

15   1096 (9th Cir. 2004) (quoted above).  Nevertheless, Ms. Metaxas's factual allegations and her

16   recitation of out-of-circuit authority create some uncertainty about the mechanics of the SERP,[7]

17   and so the Court will assume, *arguendo*, that she states a plausible claim of abstraction as a

18   predicate act under RICO.

19   D.      Pattern of Racketeering Activity

20        Assuming Ms. Metaxas has stated a plausible claim of two predicate acts, the question

21   remains whether Ms. Metaxas has adequately alleged a "pattern" of racketeering activity, as

22   mandated by 18 U.S.C. § 1962(c).  The pattern element requires, as a threshold matter, that there

23   "be at least two acts of racketeering activity within ten years of one another."  *Id.*; *see also* 18

24   U.S.C. § 1961(5).  "A 'pattern' of racketeering activity also requires proof [1] that the racketeering

25   predicates are related and [2] 'that they amount to or pose a threat of continued criminal activity.'"

26

27   [7] For example, there is some question about whether the plan was funded or not given Ms.
     Metaxas's allegation that "the SERP was funded from [her] compensation." Opp'n at 19; *see also*
28   *Hill*, 841 F. Supp. 2d at 1094 (distinguishing cases where benefit plans were "funded" from those
     that had merely "vested").

United States District Court
Northern District of California

1    *Turner*, 362 F.3d at 1229 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

2    Predicate acts are related if they have "the same or similar purposes, results, participants, victims,

3    or methods of commission, or otherwise are interrelated by distinguishing characteristics and are

4    not isolated events." *H.J. Inc.*, 492 U.S. at 240.  The parties do not dispute that the predicate acts

5    alleged by Ms. Metaxas are related within the meaning of RICO.

6         As the Ninth Circuit explains, the continuity requirement aims "at eliminating RICO

7    actions against perpetrators of isolated or sporadic acts." *Sun Sav. and Loan Ass'n v. Dierdorff*,

8    825 F.2d 187, 193 (9th Cir. 1987).  The essential question in determining whether the continuity

9    requirement is met is "whether the [predicate] acts pose[ ] a threat of continuing activity." *Id.* at

10   194. Continuity has been interpreted as encompassing "both a closed- and open-ended concept,"

11   *H.J. Inc.*, 492 U.S. at 241, and a plaintiff can satisfy the requirement "either by pleading 'closed-

12   ended continuity' or by pleading 'open-ended continuity,'" *Allwaste, Inc. v. Hecht*, 65 F.3d 1523,

13   1526 (9th Cir. 1995).  Closed-ended continuity entails "a series of related predicates extending

14   over a substantial period of time," *i.e.*, more than "a few weeks or months." *H.J. Inc.*, 492 U.S. at

15   241.  Open-ended continuity involves "past conduct that by its nature projects into the future with

16   a threat of repetition." *Id.*  Courts analyze both closed-ended and open-ended continuity on a fact-

17   specific basis.  *See id.* at 242 ("Whether the predicates proved establish a threat of continued

18   racketeering activity depends on the specific facts of each case.")  While duration is an important

19   factor in determining whether closed-ended continuity is satisfied, the Ninth Circuit has described

20   the "substantial period of time" requirement as a "flexible concept" and declined to adopt bright-

21   line rules based on the temporal length of a scheme.  *See Allwaste,* 65 F.3d at 1528.  Courts also

22   consider additional factors, such as the number of predicate acts, victims, and injuries, to assess

23   whether the plaintiff has demonstrated closed-ended continuity.  *See Midwest Grinding Co. v.

24   Spitz*, 976 F.2d 1016, 1023-24 (7th Cir. 1992).  Thus, when a plaintiff alleges only a single scheme

25   with a single victim it cuts against a finding of both closed-ended as well as open-ended

26   continuity.  *See Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 365-67 (9th Cir. 1992).

27   Particularly in the context of open-ended continuity, a criminal scheme with a singular goal poses

28   no threat of continuing criminal activity once that goal is achieved.  *Id.*

United States District Court
Northern District of California

1    In its prior order, the Court ruled that Ms. Metaxas had failed to satisfy the predicate act

2    requirement in her original complaint because she "successfully alleged only one predicate act,

3    abstraction from a pension fund."  Order at 17.  Defendants argue here that the FAC has not

4    meaningfully changed Ms. Metaxas's theory of the case, which the Court previously described as

5    "a single scheme (to unlawfully deny her retirement benefits) with a single victim (herself)."  *Id.* at

6    18.  Notably, the Court's continuity analysis assumed, *arguendo*, that Ms. Metaxas *had* adequately

7    pled predicate acts of mail and wire fraud in addition to abstraction.  *Id.* at 17.  It nevertheless

8    concluded that she "ha[d] not demonstrated continuity" because Defendants' false statements to

9    regulators were "the inevitable consequence, or at most cover-up, of the completed criminal

10   scheme."  *Id.* at 17-18.  While Ms. Metaxas has amended her mail and wire fraud claims by

11   identifying the regulatory agencies, rather than Ms. Metaxas herself, as the principal victim of

12   Defendants' misrepresentations,[8] Defendants contend that the regulators remain "merely inevitable

13   players" in a circumscribed scheme ultimately focusing on Ms. Metaxas and her SERP benefits.

14   Mot. at 21; *see also* Reply at 12-14.

15   Ms. Metaxas responds that the FAC sufficiently pleads additional predicate acts related to

16   her successful abstraction claim, and that the FAC alleges both open-ended and closed-ended

17   continuity.  It establishes open-ended continuity, she argues, because Defendants' "false quarterly

18   reports omitting the SERP liability" to the FDIC and OTS/OCC "continue to be made to this day."

19   Opp'n at 24.  The FAC pleads closed-ended continuity because it alleges "dozens of related

20   predicate acts, multiple victims, and multiple injuries arising from a scheme extending from 2010

21   to the present day."[9]  *Id.*

22   _____

23   [8] *See, e.g.*, FAC ¶ 12: "From learning these facts Plaintiff was first put on notice that: (a) since
     2010 Defendants had been making false statements about GATEWAY's financial condition and
24   capital to the FDIC and OTS/OCC; (b) Defendants were doing so with the intent to defraud the
     FDIC and regulatory agencies into charging GATEWAY lower deposit insurance premiums and
25   lower regulatory fees, and that denying GATEWAY's SERP liability to Plaintiff was integral to,
     and necessitated by, Defendants [*sic*] ongoing practice of misrepresenting the bank's financial
26   condition to federal regulators."

27   [9] Specifically, given that the "mailing/wiring of false and misleading information to the FDIC and
     the OCC/OTS induced lower charges to Gateway on a quarterly basis (for the FDIC) and a bi-
28   annual basis (for OTS/OCC), each new instance of a lowered charge to Gateway based on the
     false reporting constituted a separate and distinct predicate act—a new, distinct fraud on the

The Court concludes that the fundamental character of Ms. Metaxas's claims has not changed since the Court dismissed her original complaint. Even though the FAC seeks to recharacterize the regulators as the primary targets of Defendants' scheme, it remains the case that without the targeted abstraction of Ms. Metaxas's SERP benefits none of the other predicate acts would have occurred (at least not in the manner alleged). Notably, in the section of her opposition brief arguing that the FAC has satisfied RICO's pattern requirement, Ms. Metaxas offers the following account:

> Plaintiff has alleged an ongoing scheme to operate Gateway as a racketeering enterprise. One of the predicate acts was the April 2010 abstraction by Defendants Green, Wang, and Fentriss of the funds identified by Gateway as funding its SERP liability (18 U.S.C. § 664). Then, in violation of 18 U.S.C. 1956 and 1957 [*sic*], the same defendants plus Defendant Cheung transferred *the funds freed up by the abstraction of the SERP liability* to the Bank's compensation account and obscured the provenance of the funds by using them to pay general compensation expenses.

> All six defendants were responsible for acts of mail and wire fraud (18 U.S.C. §§ 1341, 1343) consisting of the filing by Gateway every quarter of false and misleading financial reports calculated to deceive the FDIC and OTS/OCC into charging Gateway lower insurance premiums and regulatory fees due to the inflated core assets *resulting from the omission of the SERP liability*. As these violations occurred on a quarterly basis, each Defendant is chargeable for the number of false and misleading filings over the number of quarters they were an officer and director of Gateway.

> Finally, the FAC alleges two acts constituting bank fraud under 18 U.S.C. § 1344. These occurred in February of 2016 and were committed by Defendants Keefe and Lee.

Opp'n at 24 (emphasis added). As Ms. Metaxas explains Defendants' scheme, the denial of her retirement benefits continues to supply the means for, and constitutes the but for cause of, Defendants' other acts. The additional instances of racketeering activity that Defendants purportedly committed are ancillary to what remains "a single scheme with a single victim," as the Court previously held. Order at 17 (citing *Religious Tech. Ctr.*, 971 F.2d at 365-67).[10]

_____

targets." *Id.*

[10] To be sure, the FAC contains scattered references to other instances of Defendants' wrongdoing, including two other transactions that it accuses Defendants of misreporting in financial reports, such as the misreporting of the Round-Trip Transaction. *See* FAC ¶¶ 7(a) and (c); ¶¶ 86-87. But the FAC fails to offer a coherent explanation of how these transactions relate to Defendants'

In particular, while the FAC's allegations of mail and wire fraud are more detailed than those in Ms. Metaxas's original complaint, Defendants' false reports to regulators continue to be—even in Ms. Metaxas's own account—"the inevitable consequence, or at most cover-up," *id.* at 18, of the scheme to deprive Ms. Metaxas of her SERP benefits.  This conclusion is underscored by the highly contingent nature of Ms. Metaxas's mail and wire fraud allegations, which, in order to succeed on the merits, would require a finding that Defendants *did* in fact wrongfully abstract her retirement benefits.  Put another way, if Defendants were not actually liable to Ms. Metaxas under the SERP when they appropriated the retirement funds, then they did not commit fraud in reporting those funds as general assets in subsequent reports to the regulatory agencies.  Moreover, any fraud in reporting would cease upon resolution of the SERP benefits dispute: if Defendants are eventually judged liable to Ms. Metaxas for the SERP payments, *e.g.*, in the related ERISA action, then Defendants' fraudulent reporting will presumably cease, with Ms. Metaxas receiving her previously withheld benefits.  If Defendants were to prevails on the merits of the ERISA action there would be no fraud or abstraction.[11]

Defendants' conduct does not "amount to or pose a threat of continued criminal activity.'" *Turner*, 362 F.3d at 1229 (quoting *H.J. Inc.*, 492 U.S. at 239); *see also Concorde Equity II, LLC v. Miller*, 732 F. Supp. 2d 990, 999 (N.D. Cal. 2010) ("[T]he fact that Defendants continue to reap the benefits of their alleged illegal activity and/or that . . . [Plaintiff] continues to suffer the effects thereof, is of no import to the Court's 'continuity' determination.").  It does not establish open-ended continuity because, for the reasons just given, it does not "project[ ] into the future with a

---

purported abstraction of Ms. Metaxas's SERP benefits or to the Round-Trip Transaction itself.  (It is not clear, for example, how Defendants managed, in Ms. Metaxas's telling, to defraud their biggest customer out of more than $5.6 million through a bogus loan for $3.8 million.)  More importantly, Ms. Metaxas does not refer to these additional predicate acts of mail and wire fraud anywhere in her opposition brief, which is focused almost exclusively on the SERP abstraction and acts flowing from it.

[11] At the hearing on the motion to dismiss, counsel for Ms. Metaxas argued that even if the abstraction were ultimately judged lawful, Defendants' alleged violation of Generally Accepted Accounting Principles in removing the potential liability to Ms. Metaxas from its books amounts to a predicate act of mail/wire fraud.  Ms. Metaxas also raised this argument—for the first time—in her opposition brief; *see* Opp'n at 8-9.  As Defendants correctly observe, this argument was not pled in the FAC, Reply at 5, and so the Court declines to consider it in deciding this motion.

United States District Court
Northern District of California

threat of repetition." *H.J. Inc.*, 492 U.S. at 241. It also does not establish closed-ended continuity because Defendants' scheme targeted only one victim, Ms. Metaxas herself, with the regulatory agencies at most the merely incidental victims of the scheme. *See Midwest Grinding Co.* 976 F.2d at 1023-24. And while the number of Defendants' alleged predicate acts has been increased by the FAC, all of the purported acts were a part of, and dependent upon, the core act of extracting her SERP benefits. In general, it is difficult to discern a "pattern" of criminal activity where the alleged conduct derives from a single wrong directed at a single victim. The case at bar contrasts with paradigmatic RICO cases involving multiple acts against multiple victims. *See, e.g.*, *H.J. Inc.*, 492 U.S. at 249-50 (holding that various plaintiff-victims alleged a pattern of racketeering activity against defendants who paid and received "numerous bribes, in several different forms," "over at least a 6-year period"); *Allwaste*, 65 F.3d at 1529 (ruling that pattern requirement was satisfied where defendants demanded kickbacks from four victims and where "there [was] nothing to suggest that they would have ceased" because the scheme was "not connected to the consummation of any particular transaction").

In its previous order, the Court properly analogized this case to the Eleventh Circuit's decision in *Aldridge v. Lily-Tulip, Inc. Salary Retirement Plan Benefits Committee*, refusing to find continuity. *See* Order at 18-19 (discussing *Aldridge*, 953 F.2d 587 (11th Cir. 1992)). Its conclusion here is also consistent with caselaw from the Ninth Circuit and this District. In *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.*, the plaintiff brought RICO claims against a joint venturer after their agreement to broadcast a boxing match fell through; the plaintiff alleged that the defendant committed several acts of, *inter alia*, mail and wire fraud by misrepresenting the number of commitments it had received from television stations to air the match, and so had engaged in a pattern of racketeering activity. 833 F.2d 1360, 1361-62 (9th Cir. 1987). Although the Ninth Circuit recognized that the plaintiff had adequately alleged more than two predicate acts, *id.* at 1362, it held that continuity was absent because the defendant's misrepresentations were merely "parts of its single effort to induce [the plaintiff] to form the joint venture," *id.* at 1364. Since the case ultimately "involved but a single alleged fraud with a single victim," there was no threat of continuing criminal activity. *Id.* at 1363; *see also Sever v. Alaska*

24

*Pulp Corp.*, 978 F.2d 1529, 1535-36 (9th Cir. 1992) (denying continuity where plaintiff alleged numerous predicate acts but defendant's conduct amounted to "a single episode having the singular purpose of impoverishing [the plaintiff]"); *cf. Sun Sav. and Loan Ass'n*, 825 F.2d at 192-94 (finding continuity where defendant committed predicate acts of mail fraud "because they covered up a whole series of alleged kickbacks and receipts of favors, occurred over several months, and in no way completed the criminal scheme").

Likewise, in *Royce International Broadcasting Corp. v. Field*, this court held that the plaintiff failed to plead continuity where it alleged that the defendant committed several acts of mail and wire fraud to mislead it into selling a radio station.  No. 99-cv-04169, 2000 WL 236434, at *1-2 (N.D. Cal. Feb. 23, 2000).  The court noted that the plaintiff's allegations "may state a claim for fraudulent inducement to enter a single contract," but could not establish a "pattern of racketeering activity."  *Id.* at *3.  Such contract and fraud claims, the court concluded, "are not the types of activities that RICO was intended to eliminate" and a contrary ruling would "permit[ ] all allegations of broken promises in failed business transactions to constitute racketeering activity." *Id.* at *4 (internal quotations omitted).

As noted in the Court's previous order, if Defendants' efforts to conceal their original abstraction could be parlayed by Ms. Metaxas into creating RICO liability, then "every transaction could turn into a 'multiple scheme'" and "every run-of-the-mill fraud case that belongs in state court" would be transformed into a federal claim.  Order at 19 (quoting, *e.g.*, *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992)).  Having previously "decline[d] to adopt such an expansive interpretation of civil RICO," *id.*, the Court does so again here.

As Ms. Metaxas has failed to show that Defendants' conduct threatens continued criminal activity, the Court holds that she has failed to state a RICO claim under § 1962(c).  It therefore **GRANTS** Defendants' motion as to this claim.

E.    Causation

Defendants argue in their reply brief that Ms. Metaxas fails to satisfy RICO's causation element under § 1964(c).  The Supreme Court has held that a civil RICO plaintiff must "show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause

as well." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (internal quotation omitted). Proximate causation requires that there be "a direct relationship between the injury asserted and the injurious conduct alleged." *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1311 (9th Cir. 1992) (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).  Defendants assert that the FAC does not connect Ms. Metaxas's injuries to the predicate acts of mail/wire fraud and money laundering.  Reply at 14.

In its prior order, the Court found that Ms. Metaxas had "adequately alleged both but-for and proximate causation."  Order at 20.  It based this finding on her abstraction claim, as "[i]t is hard to see how the abstraction of Ms. Metaxas's SERP benefits did not lead directly to the loss of those benefits."  *Id.* at 20-21.  And while the other predicate acts she alleged bore "a less obvious connection" to her injury, the Court reasoned that RICO plaintiffs "are not required to show that each individual predicate act caused them an injury, but rather that the pattern of racketeering activity did."  *Id.* at 21 (quoting *Just Film, Inc. v. Merchant Servs., Inc.*, No. 10-cv-01993-CW, 2012 WL 6087210, at *12 (N.D. Cal. Dec. 6, 2012)).

The Court notes that there is some debate whether courts should evaluate causation by reference to the pattern of alleged racketeering activity as a whole or to each individual predicate act.  *Compare Just Film, Inc.*, 2012 WL 6087210, at *12 (citing cases from the Seventh and Eighth Circuits for the principle that plaintiffs need not "plead or prove that they were harmed by each predicate act alleged") *with Hill*, 841 F. Supp. 2d at 1097-1102 (analyzing plaintiffs' bank fraud allegations separately from their mail/wire fraud and embezzlement allegations).

The Court need not decide this issue given Ms. Metaxas's failure to otherwise plead a viable RICO claim.

F.      Conspiracy

To state a claim for RICO conspiracy under § 1962(d), plaintiffs must sufficiently allege a substantive violation of the Act under subsections (a), (b), or (c).  *See, e.g.*, *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO.").

Because Ms. Metaxas has failed to adequately plead a substantive violation of RICO under

United States District Court
Northern District of California

1  § 1962(c), the Court **GRANTS** Defendants' motion to dismiss her conspiracy claim under

2  § 1962(d), as well.

3  G.     Leave to Amend

4         If a court dismisses a complaint for failure to state a claim, it should "freely give leave [to

5  amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  A court nevertheless has discretion to

6  deny leave to amend based on "undue delay, bad faith or dilatory motive on the part of the

7  movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

8  to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."

9  *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*,

10  371 U.S. 178, 182 (1962)).

11        Ms. Metaxas requests that the Court grant her leave to amend if it finds that the FAC fails

12  to state a claim for relief.  Opp'n at 3 n.1.  But the Court has already provided Ms. Metaxas with

13  an opportunity to amend.  It will not do so again, particularly given what the Court previously

14  indicated in its earlier order—that this case entails only "a single garden-variety fraud or a

15  violation of [ERISA]" and that Ms. Metaxas would be better served "suing for breach of contract

16  or denial of ERISA benefits."  Ms. Metaxas has, in fact, pursued an ERISA claim in the related

17  action now before the Court.  *See Concorde Equity II, LLC*, 732 F. Supp. 2d at 999 (denying leave

18  to amend where plaintiff "had previously filed an amended complaint").

19                          **V.     CONCLUSION**

20        For the reasons given above, the Court **GRANTS** Defendants' motion to dismiss the

21  claims asserted in Ms. Metaxas's FAC with prejudice.  The Clerk is instructed to enter judgment

22  and close the file.

23        This order disposes of Docket No. 57.

24        **IT IS SO ORDERED**.

25

26  Dated: November 30, 2020

27                                          _____

28                                          EDWARD M. CHEN
                                            United States District Judge

United States District Court
Northern District of California

27